IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TCS John Huxley America, Inc., a Nevada corporation; TCS John Huxley Europe Limited, a United Kingdom corporation; TCS John Huxley Asia Limited, a Macau corporation; and Taiwan Fulgent Enterprise Co., Ltd., a Taiwan corporation, Plaintiffs v. Scientific Games Corporation, a Delaware corporation; Bally Technologies, Inc., d/b/a SHFL Entertainment or Shuffle Master, a Nevada corporation; and Bally Gaming, Inc., d/b/a Bally Gaming and Systems, f/k/a SHFL Entertainment, Inc., f/k/a Shuffle Master, Inc., a Nevada corporation, Defendants | Civil Action No. 1:19-cv-01846 JURY TRIAL DEMANDED |

# Complaint for Damages and Other Relief for Violation of Section 2 of the Sherman Act

## I.    Nature of the Case

1.    This is a civil action for violation of Section 2 of the Sherman Act (15 U.S.C. §2). Plaintiffs' claims are based upon monopolization of the market for automatic card shufflers for regulated casinos through:    (a) Defendants' wrongful enforcement of patents that were fraudulently procured from the U.S. Patent and Trademark Office ("USPTO" or "PTO") against

2906067

Plaintiffs and other competitors of the Defendants; (b) Defendants' sham litigation against Plaintiffs and other competitors, asserting objectively baseless claims to enforce patents known to be invalid, unenforceable and/or not infringed, with the intent to directly interfere with and adversely affect the business operations of Plaintiffs and other competitors and thereby monopolize the U.S. and world markets for automatic card shufflers designed for casino use.

## II.     Jurisdiction and Venue

2.      This action arises under the antitrust laws of the United States, specifically Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) for violation of Section 2 of the Sherman Act (15 U.S.C. § 2). This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 15 and 26; and 28 U.S.C. §§ 1331 and 1337.

3.      This Court has personal jurisdiction over Defendants in this state and district under 15 U.S.C. §22; 28 U.S.C. §§1391(b), (c), and (d); Fed. R. Civ. P. 4(k)(1); the long-arm statutes of the State of Illinois; and the Due Process Clause of the Constitution since the Defendants regularly conduct and transact business in this state and district, have a regular and established business in this district, are "found" in this district, "reside" in this jurisdiction, have agents in this state and district, and have well more than "minimum contacts" with this state and district, all as further specified in the following paragraphs. Defendants have also committed acts violating the U.S. patent and antitrust laws in this state and district and have reaped the benefits of their unlawful activities in this district and the impact of those violations will be a substantial lessening of competition in the relevant market for card shufflers in this district. Moreover, Defendants' acts, both within and without this district, have resulted in injury to Plaintiffs' business and property in this state and district and have inflicted substantial and

2

irreparable damage to Plaintiffs' business, revenues, and profits arising from activities within this district, including with respect to the sales and leases of automatic card shufflers in this district.

4.     Venue is proper in this judicial district under 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b)(1) and (2), (c)(2), and (d) because, *inter alia*, the Defendants reside in this district, inhabit this district, are found in this district, have an agent in this district and transact business in this district and are subject to personal jurisdiction in this state and district, and a substantial part of the events giving rise to the claims asserted herein arose in this state and district, as further detailed in the following paragraphs.  In addition, key witnesses, such as Messrs. Kimball Anderson and Richard Schultz, who reside in this district would not be subject to the subpoena power of courts outside this district.  Chicago is also more convenient for other key witnesses in the East and Midwest than other potential venues.  Further, key documents compiled and readily available in this district and subject to the subpoena power of this court may not be as easily obtained in other jurisdictions.  Additionally, as a result of prior litigation in this court, the court is already familiar with many of the issues presented by this case.

5.     Defendants conduct business in this state and judicial district by, *inter alia*, distributing and/or selling card shufflers which are the subject of this action to casinos located in Joliet, Aurora, Elgin, and Des Plaines.  Defendant Scientific Games Corporation ("SGC") also has a Chicago campus at 350 North Orleans St., Chicago IL 60654 and has had a 483,000 square foot technology campus and administrative office in this judicial district at 2718 Roscoe St., Chicago, IL 60018.  SGC has employed over 700 employees in Chicago and has had over 1,000 employees in Northern Illinois.  Additionally, SGC has had a long-term contract with the Illinois Gaming Board to design, implement, and administer a Central Communications System ("CCS") for Illinois that provides real-time communication and control between every licensed video

3

2906067

gaming terminal in Illinois, as well as day-to-day management of the operation of the CCS and service throughout Illinois. On information and belief, Defendant Bally Technologies, Inc., under the direction of SGC, has sold card shufflers which have been manufactured by Defendant Bally Gaming, Inc. under the direction of SGC which are based on the patents at issue in this case (owned by Bally Gaming, Inc.) to various casinos which are within the Northern District of Illinois and/or within the subpoena power of this court, *i.e.*, Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora); Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines). Defendants also conduct business with the Ameristar Casino in East Chicago and the Horseshoe Casino in Hammond. Plaintiffs also conduct business at these Chicago area casinos and would have conducted additional business with such casinos but for the unlawful and anticompetitive activities of Defendants.

## III. The Parties

6. Plaintiff Taiwan Fulgent Enterprise Co., Ltd. ("Taiwan Fulgent") is a corporation organized and existing under the laws of Taiwan, having an office at No. 99-6, Sec. 2, Nan-Kang Rd., Taipei City, Taiwan 110. Taiwan Fulgent was the named defendant in Defendants' 2009 sham litigation discussed herein and was also a target of and potentially subject to the broad injunctive relief sought by Defendants in their 2012 Nevada sham litigation against TCS America.

7. Taiwan Fulgent manufactures the A Plus series automatic card shufflers and has been producing innovative automated products for the gaming industry for over 30 years. It holds numerous patents or pending patent applications on the A Plus shuffler, which is the subject of this lawsuit, in 14 countries, including the United States.

4

8.     Taiwan Fulgent began developing its innovative A Plus series automatic card shufflers over a decade ago.  The A Plus shuffler initially was designed to handle up to six decks of cards and was later improved to handle up to eight decks of cards at once.  It can be used for virtually every card game on the casino floor, including public domain games played around the world, such as blackjack and baccarat, as well as the most popular proprietary games such as Texas Hold 'Em, Caribbean Stud, Three Card Poker, Three Card Baccarat, Pai Gow Poker, and others.  The A Plus shuffler is capable of handling plastic, paper and plastic coated cards, including embossed cards.

9.     Taiwan Fulgent's A Plus shufflers increase game speed and profitability as well as security by producing a non-traceable random shuffle that ensures fairness of the card games. The effectiveness of Taiwan Fulgent's A Plus shufflers in producing a reliably random shuffle has been certified by Gaming Laboratories International ("GLI"), an independent testing agency recognized by gaming regulators in most gaming jurisdictions around the world, as well as successfully passing the BMM Random Test.  The A Plus shuffler is less expensive and more reliable than the shufflers offered by Defendants and therefore constituted a substantial threat to the monopoly that Defendants established in the casino market for fully automated card shufflers.  Defendants responded to that threat by initiating sham litigation against Taiwan Fulgent and its exclusive A Plus distributers, *i.e.*, the TCS Plaintiffs, all of which were successfully excluded from the U.S. shuffler market by Defendants' actions as further described below.

10.     Plaintiff TCS John Huxley Europe Limited ("TCS Europe") is a United Kingdom corporation, with offices at Unit 6, Crown Road, Stoke-on-Trent, ST1 5NJ, United Kingdom. TCS Europe is licensed to do business, including gaming activities, in multiple U.S.

jurisdictions. TCS Europe has been the exclusive worldwide distributer for Taiwan Fulgent's A Plus shuffler and has been directly and proximately damaged by Defendants' anticompetitive conduct which resulted in TCS Europe's exclusion from the U.S. shuffler market as further alleged herein. TCS Europe was a target of and potentially subject to the broad injunctive relief sought by Defendants' 2012 Nevada sham litigation against TCS America and was successfully excluded from the U.S. shuffler market by Defendants.

11.     Plaintiff TCS John Huxley Asia Limited ("TCS Asia") is a corporation of Macau, with offices at Alameda Dr. Carlos d'Assumpção, Nos. 336 – 342, Cheng Feng Commercial Centre, 8th Floor Unit G, Macau, China. TCS Asia has also been and is now Taiwan Fulgent's exclusive world-wide distributor for the A Plus shuffler and has been directly and proximately damaged by Defendants' anticompetitive conduct as further alleged herein. TCS Asia was also a target of and potentially subject to the broad injunctive relief sought by Defendants in their 2012 Nevada sham litigation against TCS America and was thereby successfully excluded from the U.S. shuffler market by Defendants.

12.     Plaintiff TCS John Huxley America, Inc. ("TCS America") is a Nevada corporation, with offices at 6171 McLeod Dr., Las Vegas, Nevada 89120. It is also registered or licensed to do business in over 20 U.S. states and conducts business with casinos within the Northern District of Illinois, Eastern Division, *e.g.*, Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora); Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines). TCS America was the U.S. sub-distributor for the A Plus shuffler when it was named by Defendants in the 2012 Nevada sham litigation described herein and was a primary target of and potentially subject to the broad injunction sought by Defendants in that sham litigation, as part of Defendants' unlawful scheme to monopolize the U.S. shuffler market.

6

2906067

TCS America was also excluded from the U.S. market by Defendants.  The officers and directors and business records of TCS America are in Las Vegas, London, and Singapore.

13.     TCS John Huxley Africa (pty) Limited aka TCS John Huxley (pty) Limited ("TCS Africa") is a corporation of South Africa, a sister corporation of TCS America, TCS Europe and TCS Asia, and a member of the TCS John Huxley Group.  TCS Africa was sued by Defendants in sham litigation in South Africa as part of Defendants' plan and scheme to ensure that the A Plus shuffler was not viable anywhere in the world, including the United States, and to prevent the TCS Plaintiffs from achieving the economy of scale, field experience, reputation and infrastructure necessary to effectively compete against Defendants, including in the United States.

14.     TCS America, TCS Europe and TCS Asia are sometimes collectively referred to as "the TCS Plaintiffs."  The TCS Plaintiffs and TCS Africa are commonly owned and operated by Victoria Holdings Limited, a United Kingdom corporation, and are part of a world-wide and internationally recognized gaming supply group doing business as "TCS John Huxley" (herein, "the TCS John Huxley Group") that has serviced the gaming industry across the globe for over 45 years.  The TCS Plaintiffs are uniquely qualified to distribute the Taiwan Fulgent A Plus shufflers because of their nationwide and worldwide sales network and expertise, their extensive contacts with casinos across the U.S. and the world, and their well-earned reputation for the highest quality casino products.  The elimination of the TCS Plaintiffs from the U.S. (and other markets) has inflicted substantial damage to the U.S. market and to Taiwan Fulgent and the TCS Plaintiffs.  There are no other potential distributors of Taiwan Fulgent's A Plus shuffler with TCS John Huxley's nationwide and worldwide sales networks, casino connections, and reputation for high-quality casino products.

7

2906067

15.     The TCS Plaintiffs, through TCS Europe and TCS Asia, have been the exclusive U.S. and worldwide distributor for the Taiwan Fulgent A Plus shuffler series since January 1, 2014 and previously distributed the A Plus shuffler, through TCS Asia, since 2010, but were precluded from selling in the U.S. by the 2009 Taiwan Fulgent and 2012 TCS sham litigations addressed herein.  All of the TCS Plaintiffs were the subject of the broad injunction sought by Defendants in the 2012 Nevada sham litigation against TCS America, which sought injunctive relief against TCS America's "affiliates, subsidiaries, directors, officers, employees, attorneys and agents."  Defendants' 2012 TCS Complaint further specifically alleged that "TCS [America] and various entities with whom TCS [America] is related (i.e., other companies that are parent companies of TCS or subsidiaries of those parent companies) market gaming equipment worldwide (including the United States), including an automatic card shuffler known as the A Plus Shuffler (hereinafter "Accused Product"), which is manufactured in Taiwan [by Plaintiff Taiwan Fulgent]."  The TCS Plaintiffs, Taiwan Fulgent, and other members of the TCS John Huxley Group have each been directly and proximately damaged in their businesses and property by Defendants' anticompetitive actions, including these sham litigations.

16.     Defendant SGC is a corporation of the state of Delaware, with a corporate office in Las Vegas, Nevada and an administrative and technology campus at 350 North Orleans St., Chicago IL, and was previously located at 2718 Roscoe St., Chicago, IL.  SGC does business in this judicial district by, *inter alia*, distributing and/or selling under the Shuffle Master and/or Bally name, card shufflers which are the subject of this action to casinos located in Joliet, Aurora, Elgin, and Des Plaines.  SGC has also previously had administrative offices and manufacturing facilities that support SGC's gaming business in this judicial district at 800 S. Northpoint Road Blvd., Waukegan, IL.  SGC controls and directs the actions and operations of

2906067

the other defendants, including the authorization, maintenance and conduct of the sham litigation described herein, the conduct of the reexaminations described below, and the frauds perpetrated on the U.S. courts and the USPTO and the courts and patent offices of other countries, notably South Africa, as further described below.

17.     Defendant Bally Technologies, Inc. ("Bally" or "SHFL") is a corporation of the State of Nevada, with offices at 6650 S. El Camino Road, Las Vegas, NV.  On November 25, 2013, Bally acquired all of the stock of SHFL Entertainment, Inc. f/k/a Shuffle Master, Inc., which was merged into Bally on June 30, 2014.  SHFL Entertainment, Inc. was concurrently or thereafter dissolved as a separate corporate entity, although Defendants failed to advise the court of this fact and to substitute the proper corporate entity in at least one of the sham litigations described herein.   On November 21, 2014, Bally was, in turn, acquired by, and its operations taken over by SGC.  Bally's financial records and data were thereafter consolidated with SGC's on financial reports to the Securities and Exchange Commission ("SEC").  Bally's financial records and data have been consolidated for business purposes, and its revenues and funds have been commingled such that it is no longer possible, at least for the public, to separate or segregate Bally's and SGC's funds and revenues in any meaningful way.  Subsequent to Bally's acquisition of SHFL Entertainment, Inc. (f/k/a/ Shuffle Master Inc.) on Nov. 25, 2013, Bally, and after November 21, 2014, SGC, began using "Shuffle Master" or "SHFL" as trade names and have sold or leased card shufflers based on the patents at issue in this case under the "Shuffle Master" or SHFL name, including  to casinos within the Eastern Division of the Northern District of Illinois, *i.e.*, Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora);  Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines). For these reasons and because Bally's automatic card shuffler business has been consistently

9

known throughout the gaming industry by its former names "Shuffle Master" and "SHFL Entertainment," this Complaint will sometimes refer to SGC and/or the Bally Defendants collectively as "SHFL" or "Shuffle Master."

18.     Defendant Bally Gaming, Inc. ("BGI") is or was a corporation of the State of Nevada, with offices located at 6650 S. El Camino Road, Las Vegas, NV 89118.  BGI is or was a subsidiary of Bally Gaming International, Inc., which operates, or was operated, as a subsidiary of Alliance Holding Co., which operates, or was operated, as a subsidiary of Defendant Bally. BGI operates, under the direction of SGC management, as a manufacturer of equipment and games, including under the Shuffle Master or SHFL name, for casinos in the U.S., including all five casinos within the Northern District of Illinois (Eastern Division), *i.e*., Hollywood Casino (Joliet), Harrah's Joliet Casino & Hotel (Joliet), Hollywood Casino (Aurora), Grand Victoria Casino (Elgin), and Rivers Casino (Des Plaines).  According to assignment records in the United States Patent and Trademark Office, BGI is also the owner of record of the patents described herein.

19.     Since acquiring Bally and BGI on November 21, 2014, SGC has held itself out to the public as a single integrated entity, both financially and operationally.  On Dec. 9, 2014, Bally filed with the SEC, a Form 15 providing notice of termination of its registration under section 12(g) of the Securities Exchange Act of 1934, essentially removing itself from the rolls of publicly traded entities, and began filing consolidated financial reports with the SEC, combining its financial data with that of SGC and its other wholly owned (or controlled) subsidiaries.  As further documented by SGC's August 7, 2015 10-Q filing for the period ending June 30, 2015, all of Bally's and SHFL's financial data has been combined with SGC's.  Separate financial statements have not been publicly available for Bally or SHFL as separate entities since

10

that time. SGC's relationship with Bally far exceeds the normal scope of a parent/subsidiary relationship. SGC manages and directs Bally's internal and external affairs and determines how Bally operates on a day-to-day basis. SGC's August 7, 2015 10-Q filing with the SEC states that its operations are divided into three business segments - Gaming, Lottery, and Interactive - along product lines, rather than corporate lines. Each segment is managed by a separate executive who reports directly to the SGC CEO who is described as the "chief operating decision maker" on SGC's March 2015 Form 10-Q.

20.     To implement its corporate integration, SGC formed an "Integration Management Office" led by SGC's Chief Administrative Officer. By October 2015, SGC's website referred to "[t]he combined company" and that "[t]he combination of Scientific Games and Bally Technologies creates a premiere gaming and lottery entertainment and technology company . . . " (see "Stronger Together," www.scientifigames.com/about/bally-acquisition/ (Oct. 13, 2015)). By that date, no breakout information on Bally was available on either Bally's website or SGC's website (www.scientificgames.com). By October 2015 Bally was no longer a viable, operating entity, but a mere shell corporation through which SGC conducts its business. Subsequent to that date, Bally's operations, including those relevant to this case, were wholly directed by SGC and, to the extent Bally formally exists as a separate entity, it operates wholly as an agent of SGC.

21.     SGC's current and past Presidents and CEOs, general counsels, chief legal officers, in-house patent counsels, and the executives specifically in charge of automatic shufflers, *e.g*., Mr. Colin Helsen, who appeared as SGC's designated corporate representative in the Shuffle Tech antitrust litigation described herein, have been familiar with and involved in the sham litigations and frauds on the USPTO described herein. SGC's top management also

2906067

controlled the litigation decisions (*e.g.*, whether to press forward or terminate) in the cases described herein. For example, despite the results of the '935 and '982 patent reexaminations described herein and other information known to SGC executives, SGC executives authorized, maintained, and ratified the *DigiDeal* sham litigation well after the Bally acquisition and during the *Shuffle Tech* litigation - - which fully described and documented the various frauds perpetrated on the courts and the USPTO. SGC's outside attorneys, and specifically the Chicago office of Winston & Strawn, also assisted in the perpetration of the fraud described herein. Prior to SHFL's acquisition by SGC, SGC's top executives, Mr. Isaacs, Ms. Lever, and Mr. Mooberry, were also top SHFL executives (respectively, Chief Operating Officer, General Counsel, and Senior VP of Products and Operations) and at least Mr. Isaacs and Ms. Lever were directly responsible for and had full knowledge of the *DigiDeal* sham litigation and the concealed prior art. On information and belief, Ms. Lever's successor as General Counsel at SGC, Mr. Smail, also became aware of most, if not all, of the relevant facts alleged herein. SGC nevertheless continued to maintain, authorize, and ratify the sham *DigiDeal* litigation and associated reexaminations, the Federal Circuit appeal of the *DigiDeal* dismissal, and SGC's involvement in the DigiDeal bankruptcy proceedings, well after its acquisition of the Bally entities.

22. As described above and hereafter: (1) SCG's and Bally's funds have been commingled; (2) SGC is treating Bally's assets as its own; (3) Bally is governed and influenced by its alter ego, SGC, in particular, by the actions and directions of its chief executives and legal officers; (4) there is a unity of interest and ownership such that Bally and SGC are one and the same entity; and (5) adherence to the fiction that Shuffle Master, Bally, and SGC are separate entities would sanction a fraud on the Plaintiffs and the Court, promote injustice, and adversely affect the U.S. and worldwide markets for automatic card shufflers for casinos.

12

2906067

2906067

## IV. Violation of Section 2 of the Sherman Act--Monopolization of the U. S. Market for Automatic Card Shuffler for Regulated Casinos

### A. The Relevant Market; Defendants' 100% Market Share and Monopoly Power; Overview of Defendants' Anticompetitive Conduct

#### 1. The Relevant Market

23. Casinos routinely use automatic card shuffling machines ("shufflers") on gaming tables to automate the historically labor-intensive and unsecure process of shuffling physical playing cards between each hand of play. For the purpose of this complaint, the "relevant market" is the market in the United States for card shufflers certified and approved for use by casinos, excluding card shufflers designed for private consumer use in unregulated environments and also excluding electronic machines that randomize virtual "cards" in video-based games.

24. Various types of fully automatic card shufflers which randomly shuffle an initial set of cards without human assistance were first taught in patents issued in the early 1930s, *e.g*., U.S. Patent 1,889,729 to Hammond, filed in 1932. By the early 1990s, computer-controlled shufflers, where all "shuffling" is conducted electronically by the onboard computer, were introduced. In those shufflers, the computer determined the final "random" or other intended order for the final set of cards and the cards were mechanically sorted into that intended order.

25. Casinos demand card shufflers because they increase labor efficiency, deter player/dealer collusion and other forms of cheating, and increase the number of "hands" played each hour at each gaming table, resulting in higher casino revenues and profits and higher dealer tips.

26. There are no reasonable substitutes for automatic card shufflers for casino table games that use physical playing cards. Without an automatic card shuffler, the dealer must shuffle by hand, which is prohibited by gaming regulators in some jurisdictions and is less

14

2906067

economical and less secure in all jurisdictions, or use pre-shuffled cards. Pre-shuffled cards, whether pre-shuffled in a casino back room or pre-shuffled by the playing card manufacturer, have not proven to be an economically viable or secure substitute for automatic card shuffling machines. Pre-shuffled cards can only be used for one hand of cards, after which an additional pack of pre-shuffled cards needs to be used or the used cards need to be shuffled by hand or by machine. Moreover, there have been several instances of cheating based on pre-shuffled cards that were not in fact randomly shuffled. These instances of cheating involving pre-shuffled cards which were defectively shuffled resulted in multi-million dollar losses by the affected casinos.

27.    There are high barriers to entry to any potential competitor wishing to enter the relevant market. The U.S. casino industry is very highly regulated, in multiple ways, by multiple gaming regulators, including by the state and/or Indian reservations where the casinos are located. Such regulations include licensing of the vendors to casinos, including vendors of gaming machines and ancillary equipment, as well as testing and licensing of the gaming equipment itself. In the case of card shufflers, such regulations include character and financial investigations of the potential vendors as well as rigorous testing of the shuffling equipment, including for randomness, by certain states, such as Nevada, as well as by testing companies such as Gaming Laboratories International ("GLI"). In addition to such regulation and testing, equipment such as shuffling machines must be field tested by the individual casinos or casino chains contemplating lease or purchase of machines. As a result of all these factors, entry into the casino shuffling machine market is extremely expensive, time-consuming and risky. In addition, Defendants themselves have created additional barriers to entry by their "patent thicket" of interrelated shuffler patents, which Defendants have historically used to keep out any

and all would-be competitors, including through the use of patent fraud and sham litigation, as further detailed herein.

### 2.   Defendants' Anticompetitive Conduct, Market Share and Market Power

28.     Defendants have effectively achieved a 100% market share in the relevant U.S. market and have achieved monopoly power in that market.  Defendants' market share and monopoly power in the relevant market have not been achieved by virtue of superior acumen, innovation, skill, foresight, or industry, or by the proper functioning of the market, or by natural market conditions.  Instead, such monopoly power has been achieved as the result of SHFL's, Bally's, and SGC's purposeful abuse of the patent system and the judicial process.  For more than a decade, SGC, initially through SHFL and Bally, has engaged in a series of sham patent infringement threats and lawsuits against every potential competitor that has marketed competitive card shufflers to casinos in the United States.

29.     As a result of Defendants' anticompetitive actions, U.S. casinos have had essentially no choice in automatic shufflers since at least 2009 and Defendants' resultant market power has permitted them to raise lease and sales prices of automatic card shufflers to supra-competitive levels and to achieve monopoly profits on such sales and leases, which they have done.

30.     Defendants' sham patent litigations (generally involving the assertion of invalid, not infringed and/or unenforceable patents acquired by fraud on the issuing patent office) have been filed against the following automatic card shuffler manufacturers and distributors: (1) Casinos Austria Research Development, GmbH. ("CARD"), John Huxley Casino Equipment, Ltd and John Huxley USA, Inc. in 2002; (2) CARD, via counterclaims to CARD's declaratory judgment action in 2003-2004, followed by SHFL's acquisition of CARD and its shuffler

16

2906067

technology in 2004; (3) VendingData Corporation ("VendingData") in 2004-2009, followed by VendingData's acquisition by SHFL in 2009; (4) Taiwan Fulgent in 2009, driving Taiwan Fulgent from the market; (5) TCS Africa in the South Africa Patent Court in early 2012, forcing TCS Africa from the South Africa market in order to apply and increase the pressure on TCS America to stay out of the U.S. market (that South Africa litigation is still continuing); (6) TCS America in September 2012, again forcing TCS America, Taiwan Fulgent, and the A Plus shuffler from the U.S. market; and (7) DigiDeal Corporation, in October 2012, forcing DigiDeal and the DigiShuffle automatic shuffler from the market in 2014. These litigations, individually and in combination, have successfully achieved, maintained and preserved Defendants' complete monopoly of the U.S. market for automatic card shufflers for casinos.

31.     SHFL first achieved complete monopolization of the U.S. market in 2009, when SHFL, after suing and acquiring CARD, acquired the shuffler assets and patents of its only remaining competitor, VendingData. SHFL's sham patent infringement litigation and the continued threat of such litigation against Taiwan Fulgent, the TCS Plaintiffs, DigiDeal, Shuffle Tech and Shuffle Tech's business partners have preserved that complete monopoly for the past decade. This monopolistic conduct has resulted in the achievement of monopoly power and enabled the monopoly pricing engaged in by Defendants.

32.     SHFL's 2012 Annual Report, the last year that contained detailed shuffler sales and leasing information, indicated that, as of the report date, SHFL had 8,285 SHFL shufflers on lease worldwide (primarily in the US), with an average monthly lease of $451/unit, producing $44,838,420 in recurring revenue. That price has subsequently been increased by Defendants, after they successfully drove TCS, Shuffle Tech, the A Plus shuffler and the DigiShuffle from the market. According to SHFL, the majority of its leases are month-to-month and include

17

shuffler service and support. In 2012, SHFL sold 2,135 units at an average price of $15,843, for total sales of $33,824,805. Once again, that sale price was further increased after SHFL drove the A Plus shuffler and DigiShuffle from the market. SHFL's shuffler service revenue in 2012 was approximately $11,839,000, including monthly service fees for shufflers purchased and owned by casinos. SHFL's total utility segment revenue (excluding chipper sales) was $92,502,000 in 2012, comprised of almost $34,000,000 in one-time sales (subject to ongoing support revenue) and $59,000,000 in recurring revenue. SHFL's, Bally's, and SGC's annual shuffle revenues have thereafter exceeded $100,000,000 per year. Those Defendants cumulatively earned over $1 billion in shuffler revenues through 2018.

## B. Defendants' Anticompetitive Sham Litigations

### 1. Overview of the Sham Litigation against Taiwan Fulgent

33. As a result of the threat posed to its monopoly from Taiwan Fulgent's A Plus shuffler, SHFL took immediate action when Taiwan Fulgent arranged to show its A Plus shuffler at the November 2009 Global Gaming Expo ("G2E") in Las Vegas by filing a complaint for patent infringement against Taiwan Fulgent on November 11, 2009 based on multiple patents, which, as detailed herein, were obtained by intentional fraud on the USPTO. These patents were known by SHFL to be invalid, unenforceable and/or not infringed at the time that SHFL filed its complaint against Taiwan Fulgent with the purpose of unlawfully excluding Taiwan Fulgent and its A Plus shuffler from the market. In addition to basing their infringement complaint on patents known to be invalid and unenforceable, SHFL failed to perform a reasonable pre-filing investigation to determine whether Taiwan Fulgent's A Plus shuffler actually infringed any of the asserted patents. SHFL did not inspect the actual shuffling mechanism of the A Plus shuffler, which was essential to any meaningful determination of patent infringement.

18

34.     As a result of SHFL's sham Complaint and Taiwan Fulgent's financial inability to defend U.S. patent infringement litigation, which can require millions of dollars in legal expenses, Taiwan Fulgent was forced to agree to refrain from selling the A Plus shuffler or any similar shuffler in the United States for a period of three years and to only show the A Plus shuffler with a prominent disclaimer stating that the shuffler was not available in the United States.

35.     As a result of Taiwan Fulgent's forced agreement to forego sales in the largest gaming jurisdiction in the world, Taiwan Fulgent was unable to negotiate a worldwide distribution agreement.   Accordingly, when Taiwan Fulgent negotiated its international distribution agreement with TCS Asia in June 2010, that agreement excluded the United States until April 2013.  Because of the parties' fear of financially ruinous patent infringement actions by SHFL in other countries, their June 2010 Shuffling Machine Distribution Agreement also excluded the United Kingdom, Austria, Southern Africa and South Korea.  As a result, the minimum sales required under the distribution agreement were a small fraction of what they would have been but for Defendants' unlawful actions.  The June 2010 Shuffling Machine Distribution Agreement was subsequently amended, by Addendum, on August 1, 2011, to include Southern Africa in the licensed sales territory.

### 2.     Overview of the TCS Sham Litigations

36.     After the 2011 Addendum, TCS Africa began marketing the A Plus shuffler in South Africa.  As a result of its features, reliability and price, as well as TCS' sales infrastructure and expertise, the A Plus shuffler was extremely well received in the South Africa market and TCS was very quickly able to place over 100 units of the A Plus shuffler in various casinos in South Africa, comprising a substantial portion of the market.  However, TCS was forced to cease

19

sales and marketing as a result of a judgment and injunction improperly obtained by Defendants on May 17, 2016. Defendants' bad faith patent infringement litigation against TCS Africa was based on patents that were counterparts to, and derived priority from, U.S. patents obtained by the frauds on the USPTO described herein. That litigation was initiated by Shuffle Master, Inc. and subsequently prosecuted by Defendant Bally Gaming, Inc., as successor by merger to SHFL Entertainment, Inc. f/k/a Shuffle Master, Inc., and thereafter by and/or under the control of SGC. That litigation was, like the Taiwan Fulgent litigation, based on patents known to be invalid, unenforceable and/or not infringed as a result of frauds perpetrated by Defendants against the South Africa Patent Office and courts.

37.     Prior to the South Africa judgment and injunction, but while the South Africa litigation was pending, the TCS Plaintiffs registered to show the A Plus shuffler at the 2012 G2E show in Las Vegas. As a result of the TCS Plaintiffs' merely registering to show the A plus shuffler at G2E, SHFL filed yet another bad faith patent litigation against the TCS Plaintiffs in the Federal District Court for the District of Nevada on September 14, 2012. Although the named defendant in this Nevada lawsuit was TCS America, the lawsuit alleged that "TCS [America] and various entities with whom TCS [America] is related to (i.e. other companies that are parent companies of TCS or subsidiaries of those parent companies) market gaming equipment worldwide (including the United States), including an automatic card shuffler known as the A Plus Shuffler (hereinafter "Accused Product"), which is manufactured in Taiwan." SHFL also sought injunctive relief against TCS America's "affiliates, subsidiaries, directors, officers, employees, attorneys and agents," in other words, all of the TCS Plaintiffs.

38.     SHFL's attorneys in the Las Vegas sham litigation included Kimball Anderson and Howard Shin of the Chicago law firm Winston & Strawn. Mr. Anderson, who resides and

2906067

practices in this judicial district, had also acted as counsel for Defendants in their prior bad faith litigation against Taiwan Fulgent. In his capacity as Defendants' lead counsel, Mr. Anderson wrote to TCS America on September 14, 2012, specifically tying the Nevada lawsuit to alleged infringements of Defendants' fraudulently obtained patents in various jurisdictions around the world, including a specific reference to the South Africa sham litigation against TCS Africa. In that letter, Mr. Anderson, on behalf of Defendants, required TCS to cease showing the A Plus shuffler anywhere in the United States and to refrain from showing that shuffler to any entity, regardless of jurisdiction or country, at the 2012 G2E exposition or at any offsite venue during that convention.

39.     As further described herein, Mr. Anderson had previously represented VendingData as a defendant in one of the prior bad faith patent infringement suits brought by SHFL. Mr. Anderson characterized the VendingData litigation as sham litigation, repeatedly accusing SHFL of bringing baseless patent infringement litigation for the unlawful purpose of eliminating competition based on patents that were known to be invalid and/or not infringed. As further discussed herein, Mr. Anderson thereafter switched sides and began representing SHFL in the subsequent sham litigations initiated by SHFL which are the subject of this antitrust action (and was the subject of the *Shuffle Tech* antitrust litigation).

40.     As part of SHFL's plan, scheme and objective to monopolize the U.S and world shuffler markets through multiple sham litigations, SHFL's counsel, Kimball Anderson, advised the TCS Plaintiffs that it would not serve the Nevada sham complaint against TCS America if the TCS Plaintiffs would agree not to show the A Plus shuffler at the upcoming 2012 G2E show and to represent to the public that it was not selling the A Plus shuffler in the U.S. market. Again, as

a result of the high cost of American patent litigation, the TCS Plaintiffs were forced to accede to Anderson' demand on behalf of Defendants.

### 3. Overview of the DigiDeal Sham Litigation

41.     Almost immediately after suing TCS, on October 12, 2012, SHFL filed similar sham litigation against the manufacturer of another competing shuffler known as the DigiShuffle which had been created by a Chicago company, Shuffle Tech International LLC ("Shuffle Tech"), and was being manufactured by DigiDeal Corporation ("DigiDeal"), a Spokane gaming equipment manufacturer, pursuant to a patent and technology license agreement with Shuffle Tech.

42.     DigiDeal displayed its DigiShuffle card shuffler for the first time at the 2012 G2E show in Las Vegas on October 2-4, 2012.  The proposed retail price for the DigiShuffle was $10,995, which was very similar to the retail price of the A Plus shuffler and far less than comparable shufflers sold by Defendants.  As a result of the DigiShuffle's lower cost and simplicity of design, the market response to the DigiShuffle was very positive and demand was considerable from the start.

43.     As in the case of the A Plus shuffler, SHFL again recognized the threat of a competitor's improved technology and lower prices and immediately, on October 12, 2012, filed a sham patent infringement lawsuit against DigiDeal under Defendants' '982 patent and the '935 patent.  That lawsuit was filed in the U.S. District Court for the District of Nevada by Shuffle Master, Inc., but was thereafter continued, maintained and ratified by Bally and SGC.  As in the case of Taiwan Fulgent and the TCS cases, SHFL, Bally, and SGC had no legitimate basis for maintaining their sham litigation against DigiDeal.

44.     As in the case of Taiwan Fulgent and the TCS plaintiffs, and as further described herein, the claims asserted by Defendants against DigiDeal were invalid and/or unenforceable

22

(and/or not infringed) as result of deliberate frauds perpetrated by Defendants on the PTO and the courts. This fraud was also concealed from DigiDeal in discovery in that case and in the related *ex parte* reexaminations of the '982 and '935 patents.

45. Like the sham lawsuits against Taiwan Fulgent and the TCS Plaintiffs, the DigiDeal lawsuit was filed by SHFL (and was maintained by Bally and SGC) for the purpose of inflicting collateral, anti-competitive injury on DigiDeal, its licensors, and its licensee, as well as the market itself. This was proven in the Shuffle Tech case by the $105 million jury verdict and post-trebling $315 million judgment awarded to the Shuffle Tech plaintiffs in this Court on August 7, 2018. That case, styled *Shuffle Tech et al v. Scientific Games Corporation, et al,* case no. 1:15-cv-3702 (N.D.Ill.), asserted and proved a violation of Section 2 of the Sherman Act. It was settled on December 24, 2018 for $151.5 million.

## C. Plaintiffs' Continuing Damages

46. Taiwan Fulgent has been attempting to enter the U.S. market with its A Plus shuffler since at least 2009 and has made substantial preparations to do so. The TCS Plaintiffs have been attempting to enter the U.S. shuffler market with Taiwan Fulgent's A Plus shuffler since at least 2010. Those plans have been thwarted by Defendants' anticompetitive conduct, i.e., the sham litigations described herein and Defendants' resultant monopolization of the U.S. shuffler market.

47. As a result of Defendants' repeated sham litigations against Plaintiffs and others, Taiwan Fulgent and the TCS Plaintiffs have suffered substantial damage to their business and property as a result of their exclusion from the U.S. market in the form of lost shuffler sales and profits, as well as lost sales and profits of other products that would have been sold by the

2906067

Plaintiffs had they been allowed to sell their A Plus shuffler in the United States and elsewhere. Those lost profits exceed $100,000,000 to date.

48. As part and parcel of Defendants' unlawful scheme to monopolize the U.S. and world automatic shuffler markets, the TCS Plaintiffs have also been forced to expend substantial legal expenses to defend themselves against SHFL's sham patent infringement claims, including in South Africa. TCS Africa was also wrongfully required to pay Defendants' costs in the South Africa Patent Court.

49. Plaintiffs continue to suffer damages to their business and property as a result of the coercive, intimidating and chilling effect of Defendants' massive "patent thicket" of interrelated shuffler patents and continuing practice of initiating sham litigation based on fraudulently obtained patents against any and all competitors and against any and all competitive products that are introduced into the U.S. automatic card shuffler market. Based on Defendants' repeated misuse of the judicial system to date, based on one or more of the patents in Defendants' "patent thicket," Defendants' strategy in this regard has proven to be a very affective barrier to entry into the U.S. (and other) markets and has effectively excluded Plaintiffs from the U.S. market.

### D. Defendants' Fraud on the PTO

#### 1. Relevant Individuals and Third Party Entities

50. Jennifer Farrar is Defendants' in-house patent attorney and has been in this role since December 1996. She is the in-house patent attorney who drafted, filed and/or prosecuted the patent applications that resulted in all of the shuffler patents that were asserted in the various litigations discussed herein. She also attends tradeshows for the purpose of monitoring competitive activity, including the introduction of competitive shufflers at tradeshows. She

24

worked closely with and supervised Defendants' outside patent attorney, Mark Litman, in connection with obtaining all of the shuffler patents asserted in the various litigations discussed herein. She also assisted SHFL's general counsel, Jerry Smith, in connection with various sham litigations discussed herein. It is believed that she remains employed by Defendants in substantially the same role she has had over the past two decades.

51.     Attila Grauzer has been Defendants' lead engineer in charge of shuffler development since 1991. He has had primary responsibility for the design and engineering of most of Defendants' commercial shufflers and is the lead inventor listed on the relevant patents discussed herein. He is also responsible for analyzing competitive shufflers, including shufflers displayed at tradeshows, and reporting his opinions thereon to Defendants' management. Prior to that time, he provided consulting services to SHFL's founder, John Breeding, in connection with the design and engineering of its shuffler products. It is believed that Mr. Grauzer still maintains his employment as an executive of Defendants in charge shuffler development.

52.     Jerome (Jerry) Smith was the General Counsel for SHFL from March 2001 until his employment with SHFL was terminated in July 2010. He was in charge of managing SHFL's patent litigations discussed herein until his departure and was assisted in those litigations by Ms. Farrar. He also assisted in handling litigation matters by Eric Abbott while Mr. Abbott worked at SHFL from mid-2007 to mid-2014.

53.     Mark Yoseloff joined SHFL in early 2006 and was its CEO and Chairman of the Board until his employment ended around March of 2009. Mr. Yoseloff was intimately involved with the patenting and litigation strategy employed by SHFL to monopolize the relevant shuffler market, including working closely with Mr. Smith and Mrs. Farrar in implementing such strategies.

2906067

54. Colin Helsen is Defendants' Director of Utility Products and has been in that position since 2001. Mr. Helsen was involved with the patenting and litigation strategies employed by SHFL to monopolize the relevant shuffler market, including working closely with Mr. Smith, Ms. Farrar, and outside litigation counsel, including Winston & Strawn, in implementing such strategies. He was substantively involved with SHFL's patent prosecution activities and litigations discussed herein, including pre-filing investigations, and was Defendants' corporate representative in the *Shuffle Tech* litigation, including at trial.

55. Gavin Isaacs was the CEO of SHFL from April 2011 until December 2018 when his employment with Defendants ended. Mr. Isaacs was involved with the patenting and litigation strategies employed by Defendants to monopolize the relevant shuffler market, including working closely with Ms. Farrar and outside litigation counsel, including Winston & Strawn, on implementing such strategies.

56. Mark Litman was the primary outside patent attorney for SHFL in connection with preparing, filing and/or prosecuting the SHFL patent applications that resulted in all of the shuffler patents that were asserted in the various litigations discussed herein. Mr. Litman worked closely with and was supervised by Defendants' inside patent attorney, Ms. Farrar, in connection with obtaining all of the shuffler patents asserted in the various litigations discussed herein. Mr. Litman also assisted Mr. Smith and Ms. Farrar with the various sham litigations discussed herein, including the *CARD, VendingData*, and *Taiwan Fulgent* litigations. Mr. Litman's representation of SHFL ended in August of 2012.

57. The Chicago office of the law firm Winston & Strawn (W&S) had the principal role in defending patent infringement cases brought by SHFL against VendingData commencing in March of 2005, remaining adverse to SHFL in those matters until they ended in early 2009,

2906067

and then switched to a leading role in representing SHFL in later patent litigations brought against its competitors, including Taiwan Fulgent, TCS and DigiDeal.

58.     Kimball Anderson is a Winston & Strawn lawyer based in Chicago who represented VendingData against SHFL in patent infringement cases until 2009 and then switched to representing SHFL against Taiwan Fulgent, TCS and DigiDeal in various patent infringement cases brought by SHFL.  Mr. Anderson was also involved with the '751 reexamination, the '982 and '935 reexaminations, and the litigation in South Africa against TCS.

59.     Howard Shin is also a Winston & Strawn patent attorney who assisted Mr. Anderson in patent infringement cases against Taiwan Fulgent, TCS and DigiDeal.  He was also substantively involved in the reexamination proceedings for at least the '982 and '935 patents asserted against DigiDeal.  Mr. Shin was also involved with the '751 reexamination, the '982 and '935 reexaminations, and the litigation in South Africa against TCS.

### 2.  Relevant SHFL Patent Families

60.     Patent Family A is a collection of related SHFL patents that arose from a single, initial Australia patent filing (AU PO5640, filed March 13, 1997, by Rodney Johnson and Mark Piacun) from which a U.S. patent filing on March 13, 1998 (U.S. Appl. No. 09/380,943) claims a right to priority.  SHFL purchased the '943 application, from which all of the remaining patent filings in Patent Family A claim the right to benefit.  This initial U.S. patent filing issued as U.S. patent 6,267,248 and was asserted by SHFL against CARD.

61.     Patent Family B is a collection of related SHFL patents that arose from a single, initial patent filing by SHFL, U.S. Appl. No. 09/060,627, filed on April 15, 1998.  The '627 application issued as U.S. patent 6,149,154 on November 21, 2000.  The '154 patent was asserted by SHFL against CARD.  The second-issued patent in Patent Family B is U.S. patent

2906067

6,588,750. The '750 patent was also asserted against CARD. The third-issued patent in Patent Family B is U.S. patent 6,655,684. The '684 patent was asserted against VendingData. Two further patents in Patent Family B, U.S. patents 7,073,791 and 7,059,602, were asserted against TCS. A further patent, U.S. patent 8,210,535, was issued in this family. SHFL threatened TCS with an infringement suit based on the '535 patent.

62.     Patent Family C is a family of SHFL patents that arose from an initial patent filing by SHFL, U.S.  Appl. No. 09/060,598, filed on April 15, 1998. Each patent of Patent Family B and Patent Family C were initiated by very similar applications filed on the same day. These initial patent filings were then followed with the filing of respective continuation-in-part applications in each family (again filed on the same day) that had differing specifications and drawings. The '598 application was issued as U.S. patent 6,254,096 on July 3, 2001. The '096 patent was asserted by SHFL against TCS. The second-issued patent in this patent family is U.S patent 6,588,751 and was issued on a continuation-in-part application filed on October 16, 2000 of the application that issued as the '096 patent. The '751 patent was asserted against CARD, and then subsequently asserted against both Taiwan Fulgent and TCS John Huxley. The '751 patent was later involved in an *inter partes* reexamination proceeding based upon a request by Taiwan Fulgent. Two further patents in this Patent Family, U.S. Patent Nos. 7,255,344 and 7,322,576, were also asserted against Taiwan Fulgent.

63.     Patent Family D is a Patent Family of SHFL patents that arose from an initial patent filing by SHFL, U.S. Appl. No. 09/967,502 on September 28, 2001. The '502 application was issued as U.S. patent 6,651,981 on November 25, 2003. Another patent, U.S. patent 6,651,982, also issued on November 25, 2003. A third patent from Patent Family D, U.S. patent

7,523,935, issued on April 28, 2009. The '982 and '935 patents were asserted against DigiDeal and were both subjected to reexamination proceedings.

64. Patent Family E is a family of patents that arose from an initial patent filing by SHFL, U.S. Appl. No. 08/287,729, filed on August 9, 1994. Subsequently filed applications (U.S. Appl. Nos. 08/932,052 filed September 19, 1997 and 09/521,644 filed March 8, 2000) in Patent Family E were issued as U.S. patents 6,068,258 and 6,325,373 on May 30, 2000 and December 4, 2001, respectively, and were asserted against VendingData. Another application (U.S. Appl. No. 08/892,742 filed July 15, 1997) issued as 6,139,014 on October 31, 2000 and was asserted against CARD.

### 3. Relevant Prior Art

65. The Nicoletti Shuffler is an automatic card shuffling machine for use with a card gaming table, such as a blackjack table in a casino. The Nicoletti Shuffler was developed by Adolf Nicoletti in 1985 to 1989 and was built by Precision Automation, Inc. The Nicoletti Shuffler is also referred to as the "1st Roblejo Prototype" or "Roblejo 1". The Nicoletti Shuffler was publicly demonstrated and used for its intended purpose at Bally's Park Place Casino in Atlantic City, NJ for approximately one week, starting on March 12, 1990. Various newspapers published stories about the Nicoletti shuffler that explained the structure and operation thereof and the details of the public demonstration at Bally's Park Place. The Nicoletti Shuffler was sold by Mr. Nicoletti's company, We Are 21, Inc., to Casino Concepts around 1996.

66. The Nicoletti Shuffler is designed to be flush-mounted into a gaming table and included, *inter alia*, a card receiver for receiving a stack of unshuffled cards, a shuffling wheel having 16 individual compartments each designed to hold multiple cards, a first card mover that moves cards individually from the card receiver to the compartments, a second card mover that

29

2906067

moves cards from the compartments to a second card receiver upon demand, and a processor programed to control the first and second card mover in order to randomly assign each card in the stack to a compartment and then output the cards from the compartments to provide a shuffle deck of cards. Each compartment in the wheel includes a wall with a beveled surface that helps prevent jamming of the cards when they are being inserted into the compartments by providing a deflecting surface that is contacted by the cards and alters the angle of the cards when entering the compartments. The Nicoletti Shuffler also included sensors and software that counted and kept track of the number of cards in each compartment of the wheel at any given time.

67.     The Roblejo Shuffler is a second generation of the Nicoletti Shuffler, also for use with a card gaming table, such as a blackjack table in a casino. The Roblejo Shuffler was developed by Halvard Solberg (a.k.a. "Hal Solberg") and his company, Machine Design Associates, Inc. in 1996-1998 for Casino Concepts, Inc. The internal structure and operation of the Roblejo Shuffler was based on the earlier Nicoletti Shuffler, but, unlike the Nicoletti Shuffler, the Roblejo Shuffler is designed to sit next to and be operated at the side of a gaming table. The Roblejo Shuffler is also referred to as the "2nd Roblejo Prototype", "Roblejo 2", or "Sure Shuffler". The Roblejo Shuffler was publically exhibited and operated at the 1997 World Gaming Congress and Expo in Las Vegas on October 14-16, 1997.

68.     Like the Nicolleti Shuffler, the Roblejo Shuffler also included, *inter alia*, a card receiver for receiving a stack of unshuffled cards, a shuffling wheel having 16 individual compartments each designed to hold multiple cards, a first card mover that moves cards individually from the card receiver to the compartments, a second card mover that moves cards from the compartments to a second card receiver upon demand, and a processor programed to control the first and second card mover in order to randomly assign each card in the stack to a

30

compartment and then output the cards from the compartments to provide a shuffled deck of cards. Each compartment in the wheel includes a wall with a beveled surface that helps prevent jamming of the cards when they are being inserted into the compartments by providing a deflecting surface that is contacted by the cards and alters the angle of the cards when entering the compartments. The Robejo Shuffler also included sensors and software that counted and kept track of the number of cards in each compartment of the wheel at any given time.

69.     U.S. patent 5,989,122 (the "Roblejo '122 patent") is directed to and discloses an automatic card shuffler for table games. The Roblejo '122 patent issued on November 3, 1999, based on a patent application that was filed on January 3, 1997. The Roblejo '122 patent generally, but not completely, discloses various feature of the Roblejo Shuffler, including the card receiver, first and second card movers, and the shuffling wheel with numerous compartments designed to hold multiple cards in each compartment, wherein each compartment includes a wall with a beveled surface that helps prevent jamming of the cards when they are being inserted into the compartments by providing a deflecting surface that is contacted by the cards and alters the angle of the cards when entering the compartments. These features are shown even more clearly in the Roblejo shuffler itself. The Roblejo patent does not disclose the feature of counting and keeping track of the number of cards in each compartment of the wheel at any given time.

70.     The Luciano shuffler is an automatic card shuffling machine for use with a card gaming table, such as a blackjack table in a casino. The Luciano shuffler was developed by Lawrence (Larry) Luciano and his company, Luciano Packaging Company, in 1992-1993. The shuffler was initially developed under contract for International Gaming Technology, Inc. (IGT) but later marketed directly by Luciano Packaging Company starting in 1993 after the IGT

31

contract was canceled. A marketing video of the Luciano shuffler was made in 1993 in order to show the structure and operation thereof. The marketing video was distributed to numerous gaming companies in 1993 and 1994, including SHFL, in order to market the Luciano shuffler the relevant public.

71. The Luciano shuffler is designed to be flush-mounted into a gaming table so that only the card input and output areas are visible on the table. The shuffler includes, inter alia, a first card receiver for receiving a stack of cards to be shuffled, a first card mover for moving cards into a shuffling wheel having a compartment for each card to be shuffled, and a second card mover for moving cards out of the wheel into a second card receiver. The wheel is controlled by a microprocessor that rotates the wheel to a random slot to deliver a random card that is output from the wheel, using an elevator arm with rollers, to a dealing shoe located above the surface of the table. The microprocessor uses input from sensors to count and keep track of the number of and identity of cards in the shuffling wheel at any given time during shuffling. Sensors and processing are also provided to sense when a predetermined number of cards are not present in an output area of the shuffler and, in response, to deliver additional cards to meet the minimum number desired.

**G.  Specific Instances of Fraud at the USPTO**

**1.  Fraud in the Procurement of the '096 Patent**

72. SHFL and its attorneys committed fraud on the PTO in order to obtain allowance of the '096 patent asserted against TCS. At least Farrar, Litman and Grauzer (as well as the other named inventors) and SHFL, all of whom were substantively involved with prosecution of the '096 patent and had a duty of disclosure to the PTO during prosecution, were well aware of material prior art and intentionally concealed the art from the PTO. At least the Roblejo '122

2906067

patent and the Roblejo Shuffler (including all the material information in their possession relating to this shuffler) were intentionally concealed from the PTO. The Roblejo '122 patent was disclosed in the '750 application in January of 2001. The '096 patent was pending until July 2001 and there is no excuse for SHFL to have failed to disclose this critical prior art patent in the '096 application since it discloses the rack assembly having card receiving compartments that can receive more than one card, wherein each compartment includes a plate member that includes a beveled surface, which are the features on which SHFL and the PTO relied for patentability of the '096 patent.

73. There was also no excuse for SHFL to have withheld the critical information it had learned at the 1997 Expo relating to the Roblejo Shuffler, including the fact that the wheel, disclosed and seen by SHFL (including at least Grauzer, Farrar and other SHFL representatives) at the 1997 Expo, had compartments designed to hold multiple cards and included the beveled surface as claimed. All of this information was required to be disclosed under applicable rules and laws. The '096 patent would not have issued had the prior art not been intentionally concealed from the Examiner by SHFL and its representatives. Farrar, Grauzer and Litman knowingly incorporated what SHFL had learned from the 1997 Expo into its '096 patent application and then claimed features that they knew SHFL had not invented and were instead known to be present in the prior art Roblejo Shuffler.

### 2. Fraud in the Procurement of the '751 Patent

74. SHFL and its attorneys committed fraud on the PTO in order to obtain allowance of the '751 patent asserted against CARD, Taiwan Fulgent and TCS. At least Farrar, Litman and Grauzer (as well as the other named inventors) and SHFL, all of whom were substantively involved with the prosecution and had a duty of disclosure to the PTO during the prosecution of

33

the '751 patent, were well aware of material prior art and intentionally concealed the art from the PTO. At least the Roblejo '122 patent and the Roblejo Shuffler (including all the material information in their possession relating thereto) were intentionally concealed from the PTO. All of this information was required to be disclosed under applicable rules and laws. The '751 patent would not have issued had the prior art not been intentionally concealed from the Examiner by SHFL and its representatives.

75. At least Farrar, Grauzer and Litman were well aware of the Roblejo '122 patent, having disclosed it in January 2001 in the '750 pending application. The '750 patent family and the '751 patent family had almost identical patent specifications and are directed to substantially the same subject matter. Therefore, there is no legitimate excuse for SHFL to have disclosed the Roblejo patent in the '750 application, but not in the '751 application. On the contrary, at least Farrar and Litman intentionally concealed the Roblejo patent in the '751 application in order to obtain claims that were much broader than they otherwise would have obtained had the Roblejo patent been disclosed. This intentional concealment is further evidenced by the fact that SHFL selectively disclosed the Roblejo patent in a continuation application of the '751 patent (Serial Number 10/285,973) while the '751 patent was still pending, but still failed to disclose it in the parent '751 application. The '751 patent would have never issued had the Roblejo patent been properly disclosed in the '751 application, as proven by the results of the '751 reexamination discussed herein.

76. The Roblejo Shuffler was intentionally concealed by at least Farrar and Grauzer in order to obtain allowance of the '751 claims. At least Farrar and Grauzer, as well as numerous other SHFL representatives, personally inspected the Roblejo Shuffler at the 1997 World Gaming Expo in Las Vegas, Nevada, as confirmed by the depositions of Stephen Gola, Hal

Solberg, Ms. Farrar and Mr. Grauzer, by the corporate records of Casino Concepts (including the report prepared by Mr. Gola regarding the 1997 World Gaming Expo) and the corporate records of SHFL (including the 1997 Report on Shuffler Competition prepared by Grauzer, and provided to Farrar and others at SHFL).

77.     Farrar and Grauzer (as well as numerous other SHFL representatives) personally observed and inspected the Roblejo Shuffler at Casino Concepts' booth during the 1997 Expo, thereby obtaining first-hand knowledge of its structure, features and operation.  At least Farrar and Grauzer also obtained a Roblejo Shuffler brochure at the 1997 Expo that shows and describes the operation of the Roblejo Shuffler.

78.     Farrar, Grauzer and other SHFL representatives also met and obtained business cards from Roblejo and Gola (executives of Casino Concepts) during their visit to the Casino Concepts booth and inspection of the Roblejo Shuffler at the 1997 Expo.

79.     The Roblejo Shuffler was demonstrated at the show with transparent sides that enabled anybody that visited the booth the see the internal workings of the shuffler, including the shuffling wheel with 16 slots that were each designed to hold multiple cards per slot during shuffling, and the elements that moved the cards into and out of the slots in the wheel.

80.     Both Farrar and Grauzer maintained copies of the Roblejo Shuffler brochure and 1997 Report on Shuffler Competition in their personal files since 1997, which confirmed their inspection and their knowledge of the structure and operation of the Roblejo Shuffler.  Farrar also maintained in her department a formal collection of printed information and materials (including prior art brochures and other prior art information) on prior art shufflers, including on the Roblejo Shuffler, obtained from trade shows and the like, including the 1997 Expo, but never disclosed any of it to the PTO in connection with the '751 patent.

81.     Farrar, Grauzer and Litman were well aware that the Roblejo Shuffler constitutes prior art to the '751 patent at least as a result of it being invented by another, on sale, and publically used and disclosed by at least October 1997.  Both Farrar and Grauzer (and others at SHFL) were also well aware that the Roblejo Shuffler brochure had been distributed to the public by at least October 1997, thereby constituting a prior art printed publication.  Had the above described prior art information learned at the 1997 Expo been properly disclosed to the PTO rather than concealed, the '751 patent would not have issued.  Instead, Farrar, Grauzer and Litman knowingly and fraudulently incorporated what SHFL had learned from the 1997 Expo into its '751 patent application and wrote and/or amended claims to include features that they knew SHFL had not invented and were instead known to be present in the prior art Roblejo Shuffler.

### 3.     Fraud in the Reexamination of the '751 Patent

82.     SHFL and its attorneys committed fraud on the PTO in order to obtain allowance of the reexamined '751 patent.

83.     At least Farrar, Litman and Grauzer (as well as the other named inventors), and the law firm of Trask Britt (including at least attorney Schierman), were all substantively involved with the '751 reexamination and had a duty of disclosure, candor and good faith to the PTO during the reexamination of that '751 patent, and were well aware of material prior art and intentionally concealed the art from the PTO. At least the Nicolleti shuffler, Roblejo shuffler and Luciano shuffler were intentionally concealed from the PTO.  The reexamined '751 patent would not have issued had the art not been concealed from the Examiner.  Specifically, had SHFL or its attorneys properly disclosed the information they possessed on the Roblejo shufflers, such as the Roblejo shuffler software, the Roblejo shuffler brochure, or Mr. Solberg's deposition testimony

on the Roblejo shuffler, the '751 reexamined claims would not have been allowed, as they all disclose the exact card counting feature argued by SHFL to be absent from the prior art and to support patentability of the amended and new claims issued in the '751 reexamination. The withheld exhibits and information on the Luciano shuffler also disclose the card counting feature that SHFL relied on for patentability. All of this prior art information was stored on the "Shuffler Art" discs maintained by Ms. Farrar and Mr. Litman and regularly used by these and other individuals substantively involved with SHFL's patent prosecutions and litigations.

84.     SHFL and its attorneys also violated their duty of disclosure, candor and good faith by concealing information, including declarations, depositions and related documents described herein that, while not necessarily constituting a printed publication, were required to be disclosed in the reexaminations because they refute or are inconsistent with the arguments presented by SHFL in opposing arguments for unpatentability by the PTO as well as arguments presented by SHFL in support of patentability. This includes the various declarations (and supporting exhibits and invalidity claim charts) submitted by CARD in the *CARD* litigation, including at least those of Joel Greenberg, Stephen Gola, Larry Luciano, Hall Solberg and Robert Morrill, as well as at least the depositions (and supporting exhibits) of Greenberg, Solberg, Larry Luciano and Bob Luciano in the *CARD* and *SHFL v. MP* Games litigations, the vast majority of which were on electronic discs (known as the "Shuffler Art" discs") that had been specifically made for the purpose of disclosing to the PTO in SHFL's pending patent applications. All of this information was required to be disclosed under applicable rules and laws.

85.     Notwithstanding the fact that SHFL and its attorneys had been accused of fraud on the PTO by CARD in the *CARD* litigation in connection with the original '751 prosecution,

SHFL (including at least Farrar, Litman and Grauzer) still elected to continue to conceal this same critical prior art in the '751 reexamination, thereby clearly evidencing intent to mislead the PTO and obtain patents through continued fraud. The '751 reexamination confirmed the but-for materiality of the concealed Roblejo '122 patent to the original '751 patent, as various claims, including claim 2 on which the *CARD* preliminary injunction was based, were rejected and canceled in the reexamination based on the Roblejo '122 patent concealed during the original '751 prosecution.

38

####           4.      Other Family C Patents

86.      In view of the fraud perpetrated on the PTO in connection with the '096, '751 and '751 reexamination, all other patents later issued in this family which claim priority to the '096 or '751, including the '576 and '344 patents asserted against Taiwan Fulgent are also unenforeceable and were known by SHFL to be unenforceable when asserted against Taiwan Fulgent.  The claims of the '576 and '344 patents have an immediate and necessary relation to the claims of the '096 and '751 patents and are therefore tainted by the fraud in the '096 and '751 patents.  No inventor or attorney acting in good faith could believe otherwise.

####           5.      Fraud in the Procurement of the '154 Patent

87.      SHFL and its attorneys committed fraud on the PTO in order to obtain allowance of the '154 patent asserted against CARD. At least Farrar, Litman and Grauzer (as well as the other named inventors) and SHFL, all of which were substantively involved with the prosecution and had a duty of disclosure to the PTO during the prosecution of the '154 patent, were well aware of material prior art and intentionally concealed the art from the PTO.  At least the Roblejo shuffler (including all the material information in their possession relating thereto, as described herein) was intentionally concealed from the PTO.  All of this information was required to be disclosed under applicable rules and laws.  The '154 patent would not have issued had the art not been concealed from the Examiner.  Instead of disclosing critical information they learned about the Roblejo shuffler at the 1997 Expo, at least Farrar and Grauzer knowingly incorporated what SHFL had learned about the Roblejo shuffler into its '154 patent application and wrote and/or amended claims to include features that they knew SHFL had not invented and were instead known to be present in the prior art Roblejo shuffler.

2906067

### 6. Fraud in the Procurement of the '750 Patent

88. SHFL and its attorneys committed fraud on the PTO in order to obtain allowance of the '750 patent asserted against CARD. At least Farrar, Litman and Grauzer (as well as the other named inventors) and SHFL, all of whom were substantively involved with the prosecution and had a duty of disclosure to the PTO during the prosecution of the '750 patent, were well aware of material prior art and intentionally concealed the art from the PTO. At least the Roblejo shuffler (including all the material information in their possession relating thereto) was intentionally concealed from the PTO. The '750 patent would not have issued had the art not been concealed from the Examiner. All of this information was required to be disclosed under applicable rules and laws. SHFL concealed what they had learned about the Roblejo shuffler at the 1997 Expo, including the fact that the shuffling wheel has 16 slots that were each designed to hold multiple cards per slot during the shuffling operation, the slots in the wheel has an edge that altered the cards angle relative to the direction of the card movement when inserted into a slot in the wheel, and the shuffler included first and second elements that move the cards into and out of the slots in the wheel. Instead of disclosing this critical information, at least Farrar and Grauzer knowingly incorporated what SHFL had learned about the Roblejo shuffler from the 1997 Expo into its '750 patent application and wrote and/or amended claims to include features that they knew SHFL had not invented and were instead known to be present in the prior art Roblejo shuffler.

### 7. Fraud in the Procurement of the '684 Patent

89. SHFL and its attorneys committed fraud on the PTO in order to obtain allowance of the '684 patent asserted against VendingData. At least Farrar, Litman and Grauzer (as well as the other named inventors) were substantively involved with the prosecution and had a duty of

2906067

disclosure to the PTO during the prosecution of the '684 patent and were well aware of material prior art and intentionally concealed the art from the PTO. At least the Roblejo shuffler (including all the material information in their possession relating thereto, as described herein) was intentionally concealed from the PTO. All of this information was required to be disclosed under applicable rules and laws. The '684 patent would not have issued had the art not been concealed from the Examiner.

### 8. Other Family B Patents

90. In view of the fraud perpetrated on the PTO in connection with the '154, '750 and '684 patents, all other patents later issued in this family which claim priority to these patents, including the '791, '602 and '535 patents asserted against TCS are also unenforceable and were known by SHFL to be unenforceable when asserted against TCS. The claims of the '791, '602 and '535 patents have an immediate and necessary relation to the claims of the '154, '750 and '684 patents and are therefore tainted by the fraud in the '154, '750 and '684 patents. No inventor or attorney acting in good faith could believe otherwise.

### 9. Fraud in the Procurement of the '982 and '935 Patents

91. Following the litigation between CARD and SHFL, SHFL's litigation counsel, in cooperation with Ms. Farrar and Mr. Litman, made a collection of "Shuffler Art" discs that included all of the declarations, depositions, brochure, technical drawings, videos and related information obtained in the *CARD* litigation on the prior art Nicoletti, Roblejo and Luciano Shufflers, as well as CARD's inequitable conduct motion and related papers, for the purpose of disclosing the information to the PTO. Ms. Farrar and Mr. Litman filed a "Special Notice" to the PTO stating that they were "in the time-consuming process of reviewing" the information and asked the PTO to delay further action for two months. After their review, Ms. Farrar and Mr.

Litman filed Information Disclosure Statements ("IDSs") disclosing the Shuffler Art discs in dozens of pending applications in its shuffler Families A, B, C and E that had been asserted against CARD. However, Ms. Farrar and Mr. Litman did not disclose the 1997 Expo information or the Shuffler Art discs in any of the pending Family D applications, including the applications that resulted in the '982 and '935 patents asserted against DigiDeal. At least Farrar and Litman intentionally concealed what they had learned about the Roblejo shuffler at the 1997 Expo and the extensive information they possessed on the Shuffler Art discs relating to the prior art Nicoletti, Roblejo and Luciano Shufflers. The concealed prior art clearly anticipates claims of the '982 and '935 patents, as proven in the antitrust case styled *Shuffle Tech et al v. Scientific Games Corporation, et al*, case no. 1:15-cv-3702 (N.D.Ill).

### 10.    Fraud in the Reexaminations of the '982 and '935 Patents

92.    In response to the infringement case brought by SHFL against DigiDeal, DigiDeal initiated reexamination proceedings on the asserted '982 and '935 patents. During the pendency of the reexamination proceedings, the antitrust complaint in *Shuffle Tech et al v. Scientific Games Corporation, et al.* was filed against SHFL. The complaint pointed out that SHFL had withheld the invalidating prior art shufflers in the original '982 and '935 prosecutions and that SHFL and its attorneys were currently concealing the invalidating Nicoletti, Roblejo and Luciano shufflers in the '982 and '935 reexaminations. However, rather than finally disclose the withheld prior art to the PTO, SHFL and its attorneys (including at least Farrar, Anderson, Fanucci and Shin) made the conscious and fully informed decision to continue to conceal the invalidating references from the PTO in order to fraudulently obtain reexamined claims that it could use to maintain its sham litigation against DigiDeal. SHFL filed a Notice of Concurrent Proceedings ("NCP") in both reexaminations, in which it admitted that "Patent Owner

[Ms. Farrar] and its patent attorneys [Mr. Fanucci and Mr. Shin] have reviewed the information identified by Plaintiffs in the Complaint and determined that none of it would qualify as information material to patentability." However, even a cursory review of the withheld prior art would reveal that it was but-for material to the pending and later issued claims in the reexaminations. These actions by SHFL and its attorneys provide direct evidence of affirmative misrepresentations and specific intent to conceal the invaliding prior art shufflers in order to deceive the PTO, as proven in the antitrust case styled *Shuffle Tech et al v. Scientific Games Corporation, et al*, case no. 1:15-cv-3702 (N.D.Ill).

      **H.**      **Specific Instances of SHFL's Use of Sham Litigation to Monopolize the Relevant Shuffler Market**

      **1.**      **The *CARD* Litigation**

93.      On May 6, 2003, CARD and its U.S. subsidiary filed suit seeking declaratory judgment of non-infringement of U.S. Patents 6,149,154; 6,267,248; 6,139,014; 6,588,751, and 6,588,750 by CARD's one2six shuffler. SHFL counterclaimed on August, 25, 2003, for infringement of those and additional patents.

94.      Former SHFL General Counsel Jerry Smith declared in SHFL's lawsuit against then competitor CARD that: "… the mere showing of the [CARD] one2six has the potential ability to disrupt Shuffle Master's order taking and sales process. *It could confuse customers into believing that* there *is an alternative to Shuffle Master's shufflers available to them*." This statement was made in Declaration of Jerry Smith, ¶14, Sept. 5, 2003, in the *CARD* litigation (emphasis added). Then and now, SHFL's attitude was that no competition and no alternatives to its shufflers would be permitted in the relevant market.

2906067

95. On September 26, 2003, CARD served SHFL with its First Set of Production Requests. Document Request 22 required SHFL to produce all prior art in its files relating to the patents-in-suit. SHFL responded to CARD's First Set of Production Requests on October 27, 2003. However, SHFL failed to produce any of the documents in its possession concerning the Roblejo shuffler developed for Casinos Concepts by Dr. Conrad Roblejo, Mr. Steven Gola, and Mr. Hal Solberg, which would later become the "smoking guns" in that case. Instead, SHFL sought, and unjustly obtained on December 8, 2003, a preliminary injunction preventing CARD from making, using, or selling, or even submitting its one2six shuffler for regulatory testing.

96. CARD continued to investigate the prior art, and in particular the Roblejo shuffler device developed by Casino Concepts. On December 13, 2003, CARD Attorney Brian Ogonowsky met with Hal Solberg, the engineer who had developed the Roblejo shuffler between 1996 and 1997. On December 18, 2003, CARD obtained a declaration from Mr. Solberg, along with numerous exhibits, establishing the engineering and design of the Roblejo shuffler beginning in 1995 and the construction of the Roblejo shuffler in 1996-1997. On December 22, 2003, CARD filed a motion to dissolve the preliminary injunction entered against it based on the newly discovered evidence that the patents asserted against CARD, which formed the basis for the preliminary injunction, were invalid. The court denied the motion as untimely. Five weeks later on January 30, 2004, SHFL inexplicably produced the "smoking gun" Roblejo documents that had been requested more than four months earlier and prior to the preliminary injunction having been ordered by the court.

97. One of the documents produced by SHFL was a "Report on Shuffler Competition" from the " '97 World Expo," which confirmed that Casino Concepts (run by Dr. Roblejo and Mr. Gola) had displayed the Roblejo shuffler at the October 1997 Expo and that

44

SHFL had inspected the shuffler at the show. Attached to the report was a sales brochure for the Roblejo shuffler along with a business card from Dr. Roblejo. The sales brochure attached to the "Shuffler Competition" report was the same as the sales brochure attached to the Solberg Declaration in the *CARD* litigation, in which Mr. Solberg provided a detailed description of the Roblejo shuffler. Mr. Solberg's description and the documentation he provided on the Roblejo shuffler confirmed that it anticipated and/or rendered obvious many of the claims of SHFL's patents asserted against CARD and on which the preliminary injunction had issued.

98.     During prosecution of the patents asserted against CARD, SHFL, in bad faith and with deceptive intent, never disclosed to the USPTO what it had learned at the '97 World Gaming Expo. On February 4-5, 2004, Mr. Solberg was deposed in Dedham, Massachusetts. After that deposition, on February 13, 2004, CARD filed amended counterclaims seeking, inter alia, at Count Twelve, a declaratory judgment that, at least SHFL's patents 6,149,154, 6,267,248, 6,588,750, and 6,588,751 were unenforceable due to inequitable conduct, also seeking attorney fees. Seven days later, on February 20, 2004, faced with devastating evidence of patent misuse and fraud on the USPTO which would have eviscerated SHFL's entire shuffle patent portfolio and laid the groundwork for potential antitrust damages, SHFL agreed to stay the litigation pending negotiation between the parties. Less than 90 days later, on May 13, 2004, SHFL paid approximately $50,000,000 to acquire CARD, comprised of a cash payment and 767,076 shares of the company's common stock.

99.     Because CARD had discovered proof of SHFL's egregious misconduct before the USPTO and the district court, less than five months after CARD's discovery of the concealed prior art and fraud on the PTO, SHFL negotiated a $50 million buyout of CARD, resulting in CARD exiting the market. At the time CARD had a few million dollars of sales and a

2906067

preliminary injunction preventing it from selling its core products in the United States. Through this buyout, SHFL avoided the threat of competition and an antitrust lawsuit, solidified its monopoly position in the market, and ensured that its casino customers would have no "alternative to Shuffle Master's shufflers available to them," thus achieving the goal set in the September 2003 declaration of SHFL General Counsel Jerry Smith.

100.    In furtherance of its objective to monopolize the relevant market, SHFL has taken advantage of the fact that significant legal costs are required to defend against aggressive patent litigation, regardless of the merits of a case, and that such costs can drive the defendant out of the market and/or into SHFL's arms. SHFL has actually bragged about its sue-and-acquire strategy to the press. In a news article published in IBD on November 15, 2004, several months after SHFL acquired former competitor CARD and its competing One2Six card shuffler, SHFL's former CEO, Mark Yoseloff, explained how he forced the distress sale of CARD, a company with a "terrific product" that he coveted:

> "So we had to create a situation where they would be induced to sell," Yoseloff said. "It struck me that one way (to do that) was to sue them (and have them incur) legal fees sufficiently high even for a company the size of the parent."

### 2.    The *VendingData* Litigation

101.    Less than six months later, on October 5, 2004, SHFL filed suit against its next target, VendingData. SHFL filed this suit one day after VendingData announced the availability of its PokerOne shuffler. SHFL accused VendingData of allegedly infringing a child patent (the '684 patent) of the '154 and '750 patents in the same Patent Family B that CARD had previously demonstrated had been obtained through fraud on the PTO. Mr. Anderson of Winston & Strawn defended VendingData against SHFL and apparently was initially unaware of the proof of fraud uncovered by CARD. After the entry of a preliminary injunction against it, VendingData

eventually won its case on summary judgment of non-infringement which ended the case in February 2008 after years of litigation. During discovery, Mr. Anderson became aware of the Nicolleti, Roblejo and Luciano shufflers, as well as the Roblejo '122 patent, that had been withheld from the PTO by SHFL. During his representation of VendingData, Mr. Anderson concluded that SHFL was engaging in illegal anticompetitive conduct including "patent abuse and other violations of the antitrust laws" and made clear to SHFL that he was considering filing an antitrust case against SHFL. However, the litigation drained VendingData financially and it could not pursue the antitrust case against SHFL. Nevertheless, to eliminate antitrust threats from Mr. Anderson, SHFL approached and hired Mr. Anderson and Winston & Strawn to represent SHFL in future patent litigations thereby precluding the possibility that he or his firm could bring an antitrust case against SHFL.

102.    After VendingData spent more than $1.6 million defending itself, and despite winning its case on summary judgment of non-infringement in 2008, VendingData was forced out of business by early 2006 due to the overwhelming expense of the patent litigation and the impact of the preliminary injunction. VendingData and its successor, Elixir Gaming Technologies, Inc. ("Elixir") thereafter sold its shuffler business and its shuffler patents to SHFL for approximately $2.4 million and a seven year worldwide non-compete agreement, thereby eliminating VendingData and its products from the shuffler market.

103.    Once again, SHFL "lost the battle, but won the war," this time for a pittance, at least as compared to the CARD pay-off. VendingData spent millions of dollars to develop the PokerOne Shuffler and $1.6 million more to defend against SHFL's sham patent infringement lawsuit and won on summary judgment of non-infringement, but in the end was forced into a fire

47

sale of its shuffler assets and patents to SHFL, thereby solidifying SHFL's monopoly over the relevant shuffler market.

2906067

### 3. The *Taiwan Fulgent* Sham Litigation

104. In November 2009, SHFL sued Taiwan Fulgent for alleged infringement of several patents in Family C, including the '751 patent that was shown in the *CARD* litigation to be invalid over the Roblejo shuffler and obtained by fraud on the PTO. At least Ms. Farrar, Mr. Litman and Mr. Grauzer were involved with the pre-filing investigations and were fully aware at the time the case was brought against Taiwan Fulgent that the asserted '751, '344 and '576 patents were unenforceable, invalid and/or not-infringed. Mr. Anderson assisted with the litigation and took over the case after Taiwan Fulgent alleged that SHFL had failed to conduct a pre-filing investigation. Mr. Anderson advised Taiwan Fulgent that he had reviewed SHFL's pre-filing investigation and was "completely satisfied" that it was conducted appropriately. If Mr. Anderson actually reviewed SHFL's pre-filing investigation, it would have required Mr. Anderson (and/or his assistant Mr. Shin) to review the prior *CARD* litigation and the invalidity and inequitable conduct allegations raised by CARD regarding the asserted '751 patent (and other patents in Families B and C) that were based on Nicoletti, Roblejo and Luciano shufflers and/or the '122 Roblejo patent that had been concealed from the patent office. In view of this prior art information, no person acting in good faith, including Anderson, Shin, Farrar, Grauzer and Litman, could believe that the patents asserted against Taiwan Fulgent were enforceable in view of the fraud on the PTO or that those patents were valid over the Nicoletti shuffler, the Roblejo shuffler, the Luciano shufflers and/or the Roblejo '122 patent.

105. Faced with the overwhelming expense of patent litigation, and having no knowledge of the fraud perpetrated against it and the PTO, Taiwan Fulgent elected to withdraw from the US market and the case quickly settled in February 2010. The settlement required Taiwan Fulgent to stay out of the U.S. Shuffler market for 3 years and to make clear to any

potential customer that saw the A Plus shuffler that it was not available to the U.S. market, thereby further solidifying SHFL's monopoly over the relevant shuffler market.

106.    Hoping to eventually compete in the U.S. market with its A Plus shuffler, Taiwan Fulgent initiated reexamination requests on the asserted '751 patent (and the asserted '344 patent) which were granted by the PTO.  SHFL chose to continue its fraud on the PTO in the '751 reexamination in order to maintain maximum intimidation of Taiwan Fulgent and its TCS distributors, and keep them from competing in the U.S. market even after the settlement period expired.  Ms. Farrar, Mr. Grauzer, and Mr. Litman were substantively involved in the '751 reexamination and, notwithstanding the fact that SHFL had been previously accused by CARD of inequitable conduct for concealing the Roblejo Shuffler in the original '751 prosecution, Defendants, through those individuals, nevertheless elected to again conceal the Roblejo Shuffler in the '751 reexamination.  They also concealed the Nicoletti and Luciano Shufflers.  None of the reexamined '751 claims would have survived the reexamination if this critical prior art had not again been concealed by at least Farrar, Grauzer and Litman in the '751 reexamination.

### 4.    The *TCS Huxley* Sham Litigation

107.    In September 2012, SHFL sued TCS America, based solely on the TCS Huxley Group's registration to show Taiwan Fulgent's A Plus shuffler at the 2012 G2E show in Las Vegas, for alleged infringement of several patents in Families B and C, including U.S. patents 6,254,096, 6,588,751, 7,059,602, and 7,073,791, and again, the '751 patent that had been shown to be invalid and obtained by fraud on the PTO in the *CARD* litigation.  At the time of the TCS complaint, SHFL and its counsel were simultaneously engaged in the continued fraud in the '751 reexamination filed by Taiwan Fulgent.  Mr. Anderson and his partner Mr. Shin represented SHFL against TCS and Ms. Farrar assisted with the litigation, including with the pre-filing

investigation. Mr. Anderson, as SHFL counsel, further threatened to also sue TCS for infringing the '535 patent of Family B if TCS continued to offer the A Plus shuffler in the U.S.

108. Any legitimate pre-filing investigation for the TCS litigation would have revealed (once again) that at least the Nicoletti shuffler, the Roblejo Shufflers and the Roblejo '122 patent had been concealed in the original '751 prosecution and that the Nicoletti, Roblejo and Luciano Shufflers were currently being concealed in the '751 reexamination. In view of this information, no person acting in good faith, including Anderson, Shin, Farrar and Grauzer, could believe that any of the patents asserted against TCS were enforceable in view of the fraud on the PTO in Families B and C, or that those patents were valid over the Nicoletti shuffler, the Roblejo shuffler, the Luciano shuffler and the Roblejo '122 patent, or that those patents were infringed by the A Plus shuffler.

109. As part of Defendants' strategy to monopolize the relevant U.S. shuffler market by putting financial pressure on TCS, Defendants also sued TCS for patent infringement in South Africa in August of 2012 based on a foreign counterpart of the '096 patent asserted in the U.S. litigation. Farrar, Grauzer and Anderson were all substantively involved with the South Africa litigation. Mr. Anderson overtly used the existence of the South Africa litigation as part of Defendants' strategy to intimidate TCS into not competing in the U.S. market with the A Plus shuffler.

110. As part of Defendants' strategy to force TCS out of the shuffler business, Defendants perpetrated an elaborate fraud against TCS and the South Africa court by knowingly misrepresenting that Mr. Grauzer was an independent expert on card shufflers with no vested interest in the outcome of the litigation. Mr. Grauzer expressly represented that he was providing independent and unbiased expert testimony in that litigation in support of validity and

infringement of the patent asserted against TCS in South Africa. Defendants, including at least Farrar and Grauzer, knew full well that Grauzer held the position of Vice President of Engineering, Utility Products at SHFL, Bally and SGC during the South Africa litigation and was the opposite of an independent and unbiased expert witness. In fact, Defendants had renewed Mr. Grauzer's full-time employment contract less than two weeks before Mr. Grauzer (with full endorsement and consent of at least Ms. Farrar and other executives of Defendants) provided sworn written and live testimony in which he falsely represented to the court that he had retired five years earlier. In reality, Mr. Grauzer, a full-time Vice President of Defendants, was receiving a six-figure salary, as well as full employee benefits and stock options based on the performance of the company.

111.    Unfortunately, TCS's South Africa counsel was unaware of Defendants' blatant fraud on the court and the court relied on Mr Grauzer's testimony as its primary evidence in concluding that the asserted patents were valid and infringed by TCS. As a direct result of Defendants' fraud on the South Africa court and TCS, the court entered a judgment and injunction against TCS, destroying TCS's shuffler business in South Africa and further intimidating and hindering the TCS Plaintiffs from entering the U.S. market with their A Plus shuffler.

112.    Even though Defendants' fraud on the court was exposed by Shuffle Tech *et al.* in the *DigiDeal* litigation in this court in full view of numerous top-level executives and lawyers of Defendants, Defendants nevertheless elected to continue the South Africa litigation to this day as part of their strategy of maintaining pressure on TCS to stay out of the U.S. shuffler market.

113.    Faced with the expense of patent litigation in both the U.S. and South Africa, and having no knowledge of the on-going fraud SHFL perpetrated on the PTO and the courts, TCS

settled Defendants' U.S. case in January 2013 by effectively withdrawing from the US market, further solidifying Defendants' monopoly over the relevant shuffler market.

### 5. The *DigiDeal* Sham Litigation

114. Within a month of filing the *TCS* litigation, on October 10, 2012, SHFL filed the patent infringement case against DigiDeal which ultimately triggered the antitrust case case styled *Shuffle Tech et al. v. Scientific Games Corporation*, *et al.*, case no. 1:15-3702 (N.D.Ill) in which the jury found that SHFL had illegally monopolized the relevant shuffle market by using sham litigation predicated on invalid patents obtained by fraud and awarded $105 million in compensatory damages (automatically trebled to $315 million by the court) to Shuffle Tech *et al*.

115. That litigation was based on Defendants' assertion of the '982 and '935 patents of Family D against Shuffle Tech's licensee and manufacturer, DigiDeal. Once again, Mr. Anderson and Mr. Shin represented Defendants and Ms. Farrar participated in the litigation, including with the pre-filing investigation, which was conducted at the same time and by the same attorneys involved in the *TCS* pre-filing investigation. Any legitimate pre-filing investigation would have revealed that Defendants had concealed the extensive information they possessed on the Nicoletti, Roblejo and Luciano Shufflers, and that the concealed prior art clearly anticipated the patent claims asserted against DigiDeal.

116. DigiDeal served document requests that clearly covered the information in Ms. Farrar's files on the Roblejo Shuffler from the 1997 Expo and the extensive prior art information on the Shuffler Art discs, including the Nicoletti, Roblejo and Luciano Shufflers. However, instead of properly producing the invalidating prior art information, Defendants improperly objected to the request as being, among other things, unduly burdensome, notwithstanding that Ms. Farrar maintained a file in her office from the 1997 Expo and had multiple copies of the

53

Shuffler Art discs in her assistant's desk drawer that she routinely used to file with IDSs in the PTO. By improperly concealing the prior art in discovery, Defendants prevented DigiDeal from effectively defending itself in the litigation, just as SHFL had done in the *CARD* litigation.

117. DigiDeal initiated reexaminations on the '982 and '935 patents. However, because the prior art shufflers and related publications had been concealed by Defendants, DigiDeal was unable to use any of the withheld prior art in the reexaminations, including, for example, the Roblejo Shuffler brochure published at the 1997 Expo and the Luciano Shuffler marketing video distributed by Larry Luciano. Defendants' infringement case against DigiDeal was stayed pending reexamination, but the stay, at Defendants' insistence, required DigiDeal to cease selling its DigiShuffle shuffler and to recall the shufflers it had already placed in the market, thereby destroying its business.

118. Shuffler Tech *et al*. filed their antitrust Complaint against Defendants on April 28, 2015, while the reexaminations were still pending. The Complaint pointed out that Defendants had withheld the invalidating prior art shufflers in the original '982 and '935 prosecutions and that Defendants and their attorneys were currently concealing the Nicoletti, Roblejo and Luciano shufflers in the '982 and '935 reexaminations. However, rather than finally disclose the withheld prior art to the PTO, Defendants and their attorneys made the conscious and fully informed decision to continue to conceal the invalidating references from the PTO in order to fraudulently obtain reexamined claims that they used to maintain their sham litigation against DigiDeal. That litigation eventually caused DigiDeal to file bankruptcy proceedings. DigiDeal no longer manufactures shufflers of any kind.

## I.     <u>Plaintiffs' Antitrust Standing and Injury, Competitive Harm to the Market</u>

2906067

119.    As discussed in detail herein, Defendants' sham litigations against Taiwan Fulgent and the TCS Plaintiffs were part and parcel of Defendants' overall sham patent infringement litigation strategy, the purpose and result of which were to maintain their monopoly power and ability to raise prices to supra-competitive levels and to exclude all competitors, including specifically Taiwan Fulgent and the TCS Plaintiffs, and to exclude all competitive products, including specifically the A Plus shuffler.

120.    As a result of those sham litigations, including specifically the litigations against Taiwan Fulgent and the TCS Plaintiffs, Defendants have in fact acquired, maintained, and enhanced their monopoly power in the relevant market and now dominate the U.S. market for automatic card shufflers for regulated casinos, having virtually 100% of the market.

121.    As a direct and proximate result of Defendants' anticompetitive activities, each of the Plaintiffs have been damaged in their business and property by being excluded from the U.S. market for automatic card shufflers and by being intimidated from re-entering that market. Defendants' purposeful elimination of all competitive manufacturers and distributors of competing shufflers, including specifically Taiwan Fulgent and the TCS Plaintiffs, has directly resulted in higher prices, decreased competition in service and quality, and less innovation in the market, to the detriment of all market participants, including the casinos who purchase or lease Defendants' shufflers and their customers.

122.    Although the casinos' damages also derive from the same PTO fraud and the sham litigations against Taiwan Fulgent and the TCS Plaintiffs (and others), the casinos' damages, in the form of higher prices and reduced choices, are qualitatively and quantitatively different than the damages suffered by Taiwan Fulgent and the TCS Plaintiffs, who manufacture and distribute the competitive A Plus product unlawfully excluded from the market.  Accordingly, the instant

55

Plaintiffs are uniquely qualified to prosecute this action for their damages and have the requisite antitrust standing to do so, as this court similarly decided with respect to the Plaintiffs in the *Shuffle Tech* case.

### J. The Statutory Remedies Sought by Plaintiffs

123. Plaintiffs are entitled to treble damages and to injunctive relief under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) as a result of Defendants' violations of Section 2 of the Sherman Act (15 U.S.C. § 2) and to prevent and further restrain the expansion, maintenance, or continuation of Defendants' illegal monopolization of the relevant market.

124. Plaintiffs are also entitled to the costs of prosecuting this action, including their reasonable attorneys' fees, under Section 4 of the Clayton Act (15 U.S.C. §§ 15).

# Relief Sought

WHEREFORE, Plaintiffs pray for judgment against all Defendants determining that:

A. Defendants have violated Section 2 of the Sherman Antitrust Act by monopolizing the U.S. Market for automatic card shuffler for regulated casinos by engaging in repeated sham litigations against Plaintiffs and other competitors and by enforcing and attempting to enforce multiple patents against Plaintiffs and other market participants obtained by deliberate fraud (*Walker Process* fraud) on the USPTO.

B. Plaintiffs (as well as competition in the relevant market) have been injured in their businesses and property.

C. Plaintiffs have been injured in their property and business in an amount not less than $100,000,000.00.

56

2906067

D.    Plaintiffs are entitled to recover three times their compensatory damages, plus reasonable attorneys' fees and the costs of suit, and such injunctive and other relief as the court deems just and equitable.

March 15, 2019                                      Respectfully submitted,


                                    /s/  *Jeffery M. Cross*
                                    Jeffery M. Cross (IBN 547980)
                                    jcross@freeborn.com
                                    FREEBORN & PETERS LLP
                                    311 South Wacker Drive, Suite 3000
                                    Chicago, IL 60606
                                    Phone:  312-360-6430
                                    Fax:    312-360-6520

                                    Robert A. Rowan *(Pro Hac Vice)*
                                    rar@nixonvan.com
                                    Joseph S. Presta *(Pro Hac Vice)*
                                    jsp@nixonvan.com
                                    Nixon & Vanderhye P.C.
                                    901 North Glebe Rd.
                                    Arlington, Virginia 22203
                                    Phone:  703-816-4000
                                    Fax:    703-816-4100

                                    *Attorneys for Plaintiffs*

2906067

## Demand for Jury Trial

Plaintiffs demand a trial by jury under Fed. R. Civ. P. 38(b) and the Seventh Amendment

to the U.S. Constitution of all issues triable as of right by jury in this action.


March 15, 2019                                    Respectfully submitted,


                                   /s/  *Jeffery M. Cross*
                                   Jeffery M. Cross (IBN 547980)
                                   jcross@freeborn.com
                                   FREEBORN & PETERS LLP
                                   311 South Wacker Drive, Suite 3000
                                   Chicago, IL 60606
                                   Phone:  312-360-6430
                                   Fax:      312-360-6520


                                   Robert A. Rowan *(Pro Hac Vice)*
                                   rar@nixonvan.com
                                   Joseph S. Presta *(Pro Hac Vice)*
                                   jsp@nixonvan.com
                                   Nixon & Vanderhye P.C.
                                   901 North Glebe Rd.
                                   Arlington, Virginia 22203
                                   Phone:  703-816-4000
                                   Fax:      703-816-4100


                                   *Attorneys for Plaintiffs*

2906067

**Certificate of Service**

I certify that on March 15, 2019 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a Notification of Electronic Filing (NEF) to all counsel of record.

  /s/ *Jeffery M. Cross*
Jeffery M. Cross
jcross@freeborn.com
FREEBORN & PETERS LLP

59

2906067