UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TCS JOHN HUXLEY AMERICA, INC., et al., | |
| Plaintiffs, | Case No. 19-CV-01846 |
| v. | |
| SCIENTIFIC GAMES CORP., et al., | Judge John Robert Blakey |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

    This case arises from alleged sham patent litigation involving automatic card shufflers. Plaintiffs claim Defendants committed fraud on the Patent Office and pursued sham litigation to maintain their monopoly on the market, thereby violating § 2 of the Sherman Act. *See* [32]. Defendants moved to dismiss, arguing that Plaintiffs' claim fell outside the statute of limitations and that Plaintiffs lacked standing to bring an antitrust claim. *See* [35]. The Court denied the motion, finding that Plaintiffs had standing and finding that the record failed to conclusively demonstrate that Plaintiffs filed their claim too late. *See* [43]. Following discovery, Defendants now move for summary judgment, arguing again that Plaintiffs' claim falls outside the four-year statute of limitations. [100]. For the reasons set forth below, the Court finds that genuine issues of material fact remain concerning timeliness and, accordingly, denies the motion.

1

I.  **Background**[1]

Plaintiff Taiwan Fulgent (TF) is a Taiwanese corporation which manufactures a card shuffling device known as the A-Plus Shuffler. [102] at ¶¶ 4, 5. Plaintiffs TCS John Huxley Europe Limited, Asia Limited, and America, Inc. are subsidiaries of the TCS John Huxley Group (TCS), the exclusive worldwide distributor for the A-Plus Shuffler. *Id.* at ¶¶ 7–9. Defendants Scientific Games[2] and SG Gaming, Inc. are Nevada corporations that invent, design, manufacture, and sell casino products, including automatic card shufflers. *Id.* at ¶¶ 11–13. SG Gaming, Inc. was formerly known as Bally Gaming, Inc. *Id.* at ¶ 12. In 2013, Bally Technologies acquired SHFL Entertainment, Inc., formerly known as Shuffle Master, the original entity engaged in the invention, design, manufacture, and sale of automatic card shufflers. *Id.* at ¶¶ 14, 15.

In November 2009, Shuffle Master sued TF for patent infringement based upon the A-Plus Shuffler. *Id.* at ¶¶ 6, 18. TF retained Alston & Bird LLP, an international law firm, to represent it in the litigation. *Id.* at ¶ 20. David Ho, the owner and primary decision maker at TF, advised the attorneys he wanted the case resolved "expeditiously and efficiently." [108] at ¶ II.A.1. In December, TF's counsel sent a letter[3] raising possible issues with the pre-filing investigation of Shuffle Master's patents, claiming that Shuffle Master lacked a Rule 11 basis for claiming

---

[1] This Court takes the following facts from Defendants' Rule 56.1 Statement of Material Facts, Plaintiffs' Statement of Material Facts, and Defendants' Response to Plaintiff's Statement of Material Facts [102], [108], [119].

[2] Scientific Games formerly operated a technology campus in Chicago, Illinois. [102] at ¶ 12.

[3] Plaintiffs characterize this letter as a settlement letter, Defendants characterize it as a Rule 11 letter.

2

infringement and also suggesting the case could be settled outside of litigation as TF was not yet selling the shuffler. *Id.* at ¶¶ II.A.2,1. Counsel raised Rule 11 concerns on the mistaken belief that Shuffle Master had not accessed the inner workings of the accused shuffler to conduct a proper pre-filing investigation. *Id.* ¶ II.A.4. The litigation continued, however, and TF filed an answer and counterclaim, which included what Plaintiffs characterize as standard language regarding §§ 102, 103, and 112 defenses and counterclaims, as well as a standard request for a finding that the case was "exceptional" under § 285, to preserve the option of seeking attorney fees. *Id.* at ¶¶ 27, II.A.16. Plaintiffs represent that none of the claims or defenses they asserted in that prior litigation reflected allegations of inequitable conduct or fraud. *Id.* at ¶ II.A.16. The parties settled the 2009 litigation in February of 2010. [102] at ¶ 32. As part of the settlement agreement, both parties agreed to "release[] the other for all claims, liabilities and damages of any kind that either has or may have against the other, as of the date of this Agreement, whether known or unknown, asserted or unasserted, or accrued or unaccrued." *Id.* at ¶ 35.

After the litigation was settled, TF challenged the patentability of two of the asserted patents (the '344 patent and the '751 patent) at the U.S. Patent Office. [108] at ¶ II.B.19. As of the filing of the reexaminations in August 2010, TF believed both these patents were invalid. [102] at ¶ 43. Plaintiffs claim the challenge was based solely on prior art patents, rather than any other publications. [108] at II.B.20. They claim the prior art that Defendants withheld was hidden on CDs and DVDs that were submitted as "other publications." *Id.*

3

In late 2009 or early 2010, TF and TCS began negotiations for a distributorship agreement for TF's A-Plus Shuffler. [102] at ¶ 57. During its diligence for the arrangement, TCS expressed some concerns about Shuffle Master, asked TF for indemnity if Shuffle Master sued, and suggested that Shuffle Master would act aggressively, even illegally, to keep its monopoly advantage in the shuffler market. *Id.* at ¶¶ 59–63, 65. In fact, in September 2012, Shuffle Master sued TCS John Huxley based upon its distribution and display of the A-Plus Shuffler. *Id.* at ¶¶ 10, 66. Notably, in the suit against TCS (in contrast to the 2009 suit against TF), Shuffle Master did not allege infringement of either the '344 patent or the '576 patent. [108] at ¶ II.C.23. Plaintiffs believed this was because the PTO had by that time rejected the claims of the '344 patent as unpatentable, and the '576 patent was closely related and similar in scope. *Id.* TCS' primary patent litigation counsel was in the middle of his prior art review when the litigation settled. *Id.* at ¶ II.C.24.

On March 20, 2015, a TCS employee, Jonathon Pettemerides, learned that two TCS investors had uncovered patent fraud by Shuffle Master and planned to take legal action in the coming weeks. *Id.* at ¶ II.C.27. Mr. Pettemerides emailed three other TCS employees, including the then-Managing Director of Asia, to tell them about the patent fraud. *Id.* at ¶ II.C.28.

TF and TCS filed this antitrust complaint on March 15, 2019. *Id.* at ¶ II.C.30.

## II. Legal Standard

A Court may properly enter summary judgment when there remains "no dispute as to any material fact and the movant is entitled to judgment as a matter of

4

law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the Court "views the record in the light most favorable to the non-moving party and draws all inferences in its favor." *Shuffle Tech Int'l LLC v. Sci. Games Corp.*, No. 15 C 3702, 2017 WL 3838096, at *5 (N.D. Ill. Sept. 1, 2017) (citing *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017)).

### III. Analysis

Defendants argue that they are entitled to summary judgment for two reasons: (1) the four-year statute of limitations bars Plaintiff's claims; and (2) TF released its claims as part of a settlement agreement in 2010. 15 U.S.C. § 15b; [100]. When Defendants raised these arguments in their motion to dismiss, the Court determined that the record did not definitively set forth when Plaintiffs' claim accrued. On this issue, the Court held as follows:

> Although Plaintiffs contend that their cause of action accrued on March 8, 2019, their complaint includes allegations suggesting that they may have known something was amiss long before this date. For example, Plaintiffs allege that, in 2009, after reviewing SHFL's complaint, TF's counsel advised SHFL's counsel (on December 12, 2009), that he believed SHFL had failed to conduct a proper pre-filing investigation to confirm that the infringement allegations were valid. [32] at ¶ 120. Although SHFL responded that, in its view, its pre-filing investigation satisfied Rule 11, *id.* at ¶ 121, the fact remains that, as early as December 2009, TF may have had a factual and legal basis to conclude that the asserted patents were invalid and unenforceable, and thus TF knew or should have known that the infringement suit was groundless. The complaint, however, fails to explain the basis for counsel's assertion that SHFL failed to conduct a proper pre-filing investigation. Did counsel have reason to know when he challenged the complaint that the patents were procured by fraud or that the patents were invalid as

5

> anticipated by prior art, which SHFL had withheld? If so, Plaintiffs' cause of action may have accrued by that date. If, on the other hand, counsel's assertion stemmed from simple adversarial posturing, which would only seem prescient in hindsight, it may not have triggered the running of the statute of limitations.
>
> TF's initiation of reexamination proceedings on the asserted '751 patent may also be significant to the timeliness analysis. For example, if TF initiated reexamination because it knew or had reason to know at that time that the patentee had fraudulently withheld prior art, its discovery rule arguments would fail. But the complaint's allegations do not explain why TF requested reexamination. As such, the allegations do not definitively show that Plaintiffs' claim had expired when they filed this case on March 15, 2019.
>
> Having said that, the current record also undermines Plaintiffs' claim that its cause of action accrued on March 8, 2019. Given DigiDeal's antitrust lawsuit, in the exercise of due diligence, Plaintiffs should have been wondering about their antitrust injury long before they had a post-verdict conversation with DigiDeal's lawyers. Plaintiff's assertion of a March 8, 2019 accrual date appears to be as unreasonable as Defendants' assertion that the cause of action necessarily accrued when SHFL filed the underlying patent infringement lawsuits.

[43] at 12–13. Now, with the benefit of discovery and evidence, Defendants attempt to prove the points they argued at the motion to dismiss stage. But, as discussed below, genuine issues of material fact remain as to when Plaintiffs knew (or reasonably should have known) they had a *Walker Process* claim, and thus the record even at this stage precludes the requested ruling on timeliness and the validity of TF's release of any claim.

A key question in this case remains: when did Plaintiffs know or have reason to know that they had suffered an antitrust injury? Defendants argue that Plaintiffs knew as early as 2009, and thus their claim is barred both under the applicable four-year statute of limitations and under the release executed in 2010. 15 U.S.C. § 15b;

6

[100]. Plaintiffs claim the earliest date they could have known was March 20, 2015, just inside the four-year statute of limitations; they also claim that the release cannot be enforced as to the current claim. [107] at 13.

### A. Statute of Limitations

The Sherman Act's four-year statute of limitations applies to Plaintiffs' antitrust claim. 15 U.S.C. §15b. This statute of limitations generally begins to run "when a defendant commits an act that injures a plaintiff's business," but, as here, it can be "qualified by the discovery rule," which tolls the beginning of the period until the date when the Plaintiff discovers the injury. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Saunders v. Nat'l Basketball Ass'n*, 348 F. Supp. 649, 652 (N.D. Ill. 1972). Accrual occurs "when the plaintiff discovers that 'he has been *injured* and who *caused* the injury.'" *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (quoting *Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004)). Here, Plaintiffs' injury—exclusion from the market—occurred when Shuffle Master sued them in 2009 and 2012. But when they knew or should have known that this exclusion amounted to an antitrust injury is a separate question.

A patent infringement suit is not necessarily an antitrust injury. In fact, the *Noerr-Pennington* doctrine provides immunity from antitrust claims to patent holders. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1067–68 (Fed. Cir. 1998). To overcome such immunity, a plaintiff must show the patent holder obtained the patent through *intentional* fraud or brought the case in bad faith, with

7

*knowledge* that the asserted patent was invalid, unenforceable, or not infringed. *See Professional Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965). Thus, to know they had suffered an antitrust injury, Plaintiffs needed to know, or have reason to know, Defendants had intentionally engaged in fraud to obtain the asserted patent or brought sham litigation to keep TF from competing in the market.

Defendants argue that TF's litigation strategy and preparation, the initiation of reexamination proceedings challenging the validity of two of Shuffle Master's patents, and the discussions with TCS prior to the TF/TCS distributor agreement, all show Plaintiffs knew or had reason to know they had been injured. And, indeed, the Court flagged this issue when it noted that TF may have had a factual and legal basis to conclude that the asserted patents were invalid and unenforceable in December 2009, when it challenged Shuffle Master's pre-suit investigation. But discovery has now revealed that TF's Rule 11 challenge stemmed not from any knowledge or belief about the validity or enforceability of the asserted patents, but from the belief that Shuffle Master sued without accessing the inner workings of the accused shufflers. *See* [108] at II.A.3.

TF's counsel at the time, Helen Su, testified that, after reviewing the 2009 complaint, she reviewed the asserted patents' claims and looked at the client's product to see whether they could develop noninfringement defenses. [111] at 18. She testified that, although she sometimes reviews the documents and other publications cited in the patent, she did not do so here because she knew the client

8

wanted to settle the case quickly, without incurring unnecessary expenses. *Id.* at 18–19. She also testified that she understood that Shuffle Master "failed to conduct a very preliminary test of investigating our client's product" before filing suit. *Id.* at 22–23. She testified that the whole point of the letter described above was not to disclose any knowledge of fraud or invalidity, but to lay the groundwork for a quick settlement. *Id.* at 23, 46. She testified that TF wanted to settle quickly because "the cost of defense is so expensive, that [TF] simply could not afford [it]." *Id.* at 34. Su also explained that she commonly included invalidity and noninfringement defenses based upon a cursory review of the patents to preserve such claims for trial, *id.* at 27–28; and may have used boilerplate language because the client just wanted to settle as soon as possible without incurring legal fees, *id.* at 49. This testimony undermines Defendants' claim that TF's answer and counterclaim in the 2009 litigation necessarily reflected knowledge of invalidity, unenforceability, or fraud. Su also testified that she typically also preserved the right to seek attorneys' fees later in the case by claiming at the outset that the case was "exceptional," *id.* at 30, undermining any claim that the exceptional case allegation in TF's responsive pleading similarly reflected knowledge of antitrust injury.

Elizabeth Rader, who represented TF along with Helen Su in the Shuffle Master lawsuit, testified that she challenged Shuffle Master's pre-suit investigation because TF was not "doing anything that would constitute infringement," [110] at 46; TF was not even selling the accused product in the United States, *id.*, and, additionally, Rader had reviewed the claims of the asserted patents and knew that

9

TF's product did not "work like that," *id.* at 47. She testified that TF believed that filing the lawsuit without really understanding the nature of the accused product violated Rule 11. *Id.* at 50. She also testified that, although the asserted patents may have identified prior art sources, she did not request any of those sources because her client elected to settle the case a month after the complaint was filed. *Id.* at 55. Rader testified that her client instructed her that it "was not interested in engaging in U.S. patent litigation" and "wanted the lawsuit to be resolved expeditiously and efficiently." *Id.* at 72.

Based upon this evidence, a reasonable jury could find that TF challenged Shuffle Master's lawsuit not because it knew the asserted patents were invalid, but because it wanted to settle the matter quickly, without incurring the significant expense involved in litigating the matter. A jury could also reasonably find that, given the mandate from her client to settle quickly, Rader acted reasonably by not ordering all of the prior art CDs referenced in the asserted patents.

Defendants also argue that TF's initiation of reexamination proceedings reflected knowledge of its antitrust injury. But Andrew Spence, the attorney who initiated the reexamination proceedings on behalf of TF, testified that he never reviewed Shuffle Master's litigation history and did not consider any litigation of the asserted patents, [114] at 39; he testified that he would not have investigated in connection with the reexamination whether Shuffle Master had previously been accused of inequitable conduct; that information would serve no purpose in the reexamination proceeding, as it was irrelevant to the PTO, *id.* at 45. Spence testified

10

that, in August of 2011, about a year into the reexamination proceeding, he was continuing to assess potential prior art to be used in the reexam; and he admitted that, in February of 2011, he considered ordering, at some point in the future, the file history of art proposed for rejection of claims. *Id.* at 51. He also admitted that his billing records reflect that, on May 2, 2011, he spoke with the patent examiner regarding obtaining a copy of the file history of Roblejo, one of the prior art references cited in Defendants' patent; he testified that this likely reflected his effort to obtain non-patent literature relating to this reference. *Id.* at 51–52.

But Spence also testified that issues like inequitable conduct, fraud, and *Walker Process* fraud simply are not issues raised in a reexamination proceeding. *Id.* at 55. He testified that TF hired him to address whether the claims in the asserted patents could be canceled over the prior art on obviousness or anticipation grounds. *Id.* To the extent Defendants argue that Spence should have uncovered any hidden references or exposed secreted prior art, Spence's testimony undermines that argument: he testified that he would not have "thought much of" "other publications" cited in the patents because they would not have been available as prior art. *Id.* at 56. He testified that he has never submitted DVDs to the PTO, has never ordered DVDs from the PTO, and has never seen a DVD under the "other publications" section in a patent. *Id.* In other words, he did not discover any fraud related to references hidden on DVDs, and would not, in the exercise of reasonable diligence, have discovered such fraud. He also testified that, if the patentee submitted a CD with a bunch of shuffler prior art on it, it would be impossible to tell which of the references

11

on that CD had been considered by the patent examiner. As a result, he testified, it would be highly unusual for a patentee to submit prior art in this manner. *Id.* at 57. Spence testified, in short, that proceedings on reexamination are limited, and as a result, he reasonably limited his investigation and efforts to prior art references relied upon by the examiner, rather than hunting down lawsuits and reviewing docket sheets. *Id.* at 58, 71.

Beyond undermining Defendants' arguments about when they knew about their antitrust injury, Plaintiffs offer evidence to show that they first learned of Shuffle Master's patent fraud when TCS' Jonathan Pettemerides spoke to investors on March 20, 2015 and then emailed other TCS employees to pass along the information. [117] at 7–8. Pettemerides testified that, prior to March 20, 2015, he had no knowledge of any patent fraud or improper litigation by Shuffle Master; nor did he have any awareness of any such knowledge across the company (TCS). *Id.* at 11. If this were the case (and a reasonable jury could find that it is), this lawsuit, filed March 15, 2019, is timely.

Ultimately, the statute of limitations question turns on the same factual issues as Plaintiffs' *Walker Process* claim; the latter asks whether Defendants knew, when they sued Plaintiffs in 2009 and 2012, the asserted patents were invalid or otherwise unenforceable, *see e.g., C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1371 (Fed. Cir. 1998) ("to violate the antitrust law there must be an improper use of the patent right, 'coupled with violations of § 2.'") (emphasis added) (quoting *Walker Process*, 382 U.S. at 177–78); the former asks whether (and when) Plaintiffs knew as much. The Court

12

simply cannot resolve these issues on the current, disputed record. Certainly, the record does not allow the Court to definitively rule that Plaintiffs knew they had suffered an antitrust injury before March 15, 2015, which is what Defendants need to prove to obtain a summary judgment based upon the statute of limitations. Accordingly, the Court denies Defendants' motion for summary judgment based upon timeliness under the Sherman Act's statute of limitations.

### B. The 2010 Release

Defendants also argue that TF's current claim is barred by the release included in the settlement agreement the parties executed to resolve the 2009 litigation. The parties' agreement provided "except for each party's undertakings and obligations under [the Settlement] Agreement, each party hereby generally releases the other for all claims, liabilities and damages of any kind that either has or may have against the other, as of the date of this Agreement, whether known or unknown, asserted or unasserted, or accrued or unaccrued." [103] at 441. Initially, consistent with the Court's findings above, the record fails to establish, as a matter of law, that TF had a *Walker Process* claim "as of the date of" the Settlement Agreement. And if it did not, then the current claim falls outside the scope of the release.

Additionally, such a broad release is valid only if it is entered into knowingly and voluntarily. *See Wagner v. NutraSweet Co.*, 95 F.3d 527, 533 (7th Cir. 1996). A waiver signed under the "advice of independent counsel" is presumed knowing and voluntary "absent claims of fraud." *Riley v. Am. Fam. Mut. Ins. Co.*, 881 F.2d 368, 373 (7th Cir. 1989). But "[e]ven where the parties intend to release a specific claim,

13

the release of that claim will not be enforced if there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability." *Fed. Deposit Ins. Corp. v. FBOP Corp.*, No. 14 CV 4307, 2017 WL 5891033, at *12 (N.D. Ill. Nov. 27, 2017) (quoting *Carlile v. Snap-on Tools,* 648 N.E.2d 317, 322 (Ill. Ct. App. 1995)). Further, "[a]n exculpatory clause cannot protect persons from the results of their willful and wanton misconduct. Such a contractual shield is illegal." *Time Warner Sports Merch. v. Chicagoland Processing Corp.*, 974 F.Supp. 1163, 1175 (N.D. Ill. 1997) (quoting *Zimmerman v. Northfield Real Estate. Inc.*, 510 N.E.2d 409, 415 (Ill. App. Ct. 1986)).

Here, Defendants emphasize that sophisticated counsel represented TF during settlement, suggesting that TF made a knowing and voluntary waiver.[4] But TF's counsel testified that, when she represented TF during those settlement negotiations, she had no knowledge that TF might have a claim against Defendants for inequitable conduct, fraud, or sham litigation. [110] at 98. She testified that, although she had worked on cases where inequitable conduct allegations were a huge deal and the subject of discovery, this was not such a case. On the contrary, this case settled before it really even got started and before she spent any time considering invalidity. *Id.*

Additionally, TF argues that Defendants' attorney misled TF during those negotiations, thereby preventing TF from realizing it incurred an antitrust injury. Kimball Anderson, the attorney representing Shuffle Master in the 2009 litigation, represented to Elizabeth Rader (TF's counsel) that he had reviewed Shuffle Master's

---

[4] Defendants also repeat their arguments that TF knew about the potential antitrust claims when it released its claims. But, as explained above, issues of material fact remain as to whether Plaintiffs were aware of these claims.

14

documentation of its pre-filing investigation and was "completely satisfied that your client's A-Plus Shuffler infringes Shuffle Master's patents and that your client has violated the United States Patent Act by, among other things, making an offer to sell the infringing product at the Global Gaming Expo." [109] at 177. And Attorney Rader testified that she did not believe TF had a basis at the time of the settlement to allege inequitable conduct. [109] at 34. Similarly, she testified that, at the time of the settlement, TF had no reason to believe Shuffle Master had committed any kind of fraud on the patent office; she testified that TF was reviewing validity and analyzing prior art and just never discussed anything about Shuffle Master withholding material prior art from the PTO at that time. *Id.* at 42; [110] at 94–95.

Based upon this evidence, a jury could reasonably find that Shuffle Master fraudulently induced TF to settle the 2009 lawsuit and sign the broad release by doubling down on its infringement claim, knowing that the asserted patents were invalid or procured by fraud. Fraudulent inducement is a "classic example of an issue of fact," generally not appropriate for summary judgment. *Dopke v. Stavriotis,* No. 87 C 1069, 1987 WL 30979, at *4 (N.D. Ill. Dec. 10, 1987). Given the existence of questions of fact concerning whether TF's *Walker Process* claim existed in 2010 when the parties executed the settlement agreement, the Court declines to enter summary judgment in Defendants' favor based upon the release.

### IV.  Conclusion

For the reasons explained above, the Court finds that issues of fact remain as to whether Plaintiffs knew, or in the exercise of reasonable diligence should have

known, before March 15, 2015, that they suffered an antitrust injury. As a result, summary judgment based upon the statute of limitations or the parties' 2010 settlement agreement is inappropriate, and the Court, accordingly, denies Defendants' motion for summary judgment [100].

Dated: September 20, 2021                                   Entered:

                                                            _____
                                                            John Robert Blakey
                                                            United States District Judge