## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TCS JOHN HUXLEY AMERICA, INC.,
et al.,

            Plaintiffs,

      v.

SCIENTIFIC GAMES CORP., et al.,

          Defendants.

Case No. 19 C 1846

Judge John Robert Blakey

### MEMORANDUM OPINION AND ORDER

Plaintiffs TCS John Huxley America, Inc., TCS John Huxley Europe Limited, TCS John Huxley Asia Limited, and Taiwan Fulgent Enterprise Co. sued Defendants Scientific Games Corporation, Bally Technologies, Inc. d/b/a SHFL Entertainment or Shuffle Master and Bally Gaming, Inc. f/k/a Bally Gaming and Systems f/k/a SHFL Entertainment, Inc. f/k/a Shuffle Master, Inc. d/b/a Bally Technologies for violation of § 2 of the Sherman Act. *See* [32]. Defendants now move for summary judgment on Plaintiffs' claim. *See* [198]. For the reasons explained below, the Court grants in part, and denies in part, the motion.

## I.  Factual Background[1] and Procedural History

### A.  The Relevant Patents and the Alleged Sham Litigation

Defendants manufacture, sell, and lease automatic card shufflers for use in a variety of casino games.  [200] ¶ 1.  Plaintiff Taiwan Fulgent manufactures an automatic card shuffler called the A Plus Shuffler; Plaintiff TCS John Huxley distributes Taiwan Fulgent's A Plus Shuffler.  [200] ¶ 2.

On November 17, 2009, Defendants sued Taiwan Fulgent in federal court in Nevada, alleging infringement of U.S. Patent Nos. 6,588,751 (the '751 patent), 7,255,344 (the '344 patent), and 7,322,576 (the '576 patent).  *Id.* ¶ 3.  The parties settled three months later, on February 22, 2010.  *Id.*  On September 14, 2012, Defendants sued TCS John Huxley America, Inc. in federal court in Nevada, alleging infringement of the '751 patent, as well as U.S. Patent Nos. 6,254,096 (the '096 patent), 7,059,602 (the '602 patent), and 7,073,791 (the '791 patent).  *Id.* ¶ 4.  The parties settled four months later, on January 8, 2013.  *Id.*

More than six years later, on March 15, 2019, Taiwan Fulgent and TCS initiated this lawsuit.  *See* [1]. In the operative complaint, [32], Plaintiffs claim that Defendants' 2009 and 2012 lawsuits constituted sham litigation, pursued to crush any competitive threat posed by the A Plus shuffler and to maintain Defendants' monopoly hold on the casino automatic card shuffler market, in violation of § 2 of the Sherman Act.

---

[1] The Court draws these facts from Defendants' Rule 56.1 Statement of Undisputed Material Facts [200], Plaintiffs' response thereto and Statement of Additional Material Facts [221], and Defendants' response to Plaintiffs' Statement of Additional Material Facts [227-1].

Plaintiffs allege that Defendants have created a "patent thicket," consisting of several "patent families," as follows:

- Patent Family A is a collection of patents from which the '943 patent application (issued as the '248 patent) claims a right to priority. [32] ¶ 60.

- Patent Family B is a collection of related SHFL patents arising from the '627 patent application, filed April 15, 1998 and the '627 patent application issued as the '154 patent on November 21, 2000. *Id.* ¶ 61. Patent Family B also includes the '750, '684, '791, '602, and '535 patents. *Id.*

- Patent Family C arose from an initial patent application ('598) filed by SHFL, on April 15, 1998. *Id.* ¶ 62. The '598 patent application issued as the '096 patent on July 3, 2001. *Id.* In addition to the '096 patent, Family C also includes the '751, '344, and '576 patents.

- Patent Family D is a family of SHFL patents that arose from patent application '502 filed September 28, 2001; the '502 application issued as the '981 patent on November 25, 2003. *Id.* ¶ 63. Patent Family D also includes the '982 patent, issued November 25, 2003, and the '935 patent, issued April 28, 2009. *Id.*

- Patent Family E arose from patent application '729, filed August 9, 1994, and includes the '258 patent (issued Mary 30, 2000), the '373 patent (issued December 4, 2001), and the '014 patents (issued October 31, 2000). *Id.* ¶ 64.

Plaintiffs allege that Defendants asserted the following patents against them: (1) the '791 and '602 patents (from Patent Family B), *id.* at 61; and (2) the '096, '751, '344, and '576 patents (from Patent Family C), *id.* ¶ 62.

Plaintiffs further allege in their complaint that Defendants committed fraud on the Patent and Trademark Office ("PTO") to procure the '096 and '751 patents by intentionally concealing the Roblejo '122 patent and the Roblejo prototype. [32] ¶¶ 72, 74. They also allege fraud in the reexamination of the '751 patent, based upon Defendants' intentional concealment of the Nicolleti, Roblejo, and Luciano prototypes. *Id.* ¶ 83. They further allege that the latter issued patents—the '344 and

3

'576 patents and the '791 and '602 patents—remain tainted by that fraud. *Id.* ¶¶ 86, 90.

Defendants now argue that, as a matter of law, Plaintiffs' claims of fraud in connection with the '096 and '751 patents fail. As a result, and because Defendants disclosed the prior art references in connection with the latter issued patents, Defendants assert Plaintiffs' claims relating to those latter issued patents must fail.

### B. Monopoly and Market Share

Plaintiffs claim Defendants used their invalid patents, via sham litigation, to monopolize the casino automatic card shuffler market. To bolster their claim pf monopoly, Plaintiffs offer evidence to show that "virtually 100% of all varieties of automatic card shufflers made, sold or leased to U.S. casinos in the last 20 years were made, sold or leased by Defendants." [221] ¶ 5. Defendants dispute this, claiming that "several other companies have manufactured, sold, or leased varieties of automatic card shufflers to U.S. casinos in the last 20 years, including: Elixir Gaming Technologies, Inc. f/k/a VendingData Corporation ("VendingData"), Casinos Austria Research & Development GmbH & Co KG ("CARD"), TenStixs Gaming, DigiDeal Corporation, and AGS, [227-1] ¶ 5, (even though Defendants have enforced their patent rights with respect to at least three of these five companies based upon such sales, [32] ¶¶ 101–103 (describing sham litigation against VendingData); 93–100 (describing sham litigation against CARD); 114–118 (describing sham litigation against DigiDeal).

Indeed, Plaintiffs claim that "Defendants acquired their almost 100% share of automatic shuffler sales in the United States by successfully excluding all of their significant competitors or potential competitors through litigation and acquisitions," [221] ¶ 6. Defendants dispute the point, but they concede that they: acquired Gaming Products Pty Ltd. in 2001; acquired CARD in 2004; acquired TenStix' commercial casino distribution rights in 2008; acquired VendingData's assets, products and properties in 2009; acquired commercial distribution rights for the TenStix ProShuffler in 2009; acquired Newton Shuffler, LLC in 2010; and acquired Savant Shuffler, LLC in 2014, and they concede that they sued Taiwan Fulgent, TCS, DigiDeal, and VendingData and concede that CARD sued them for declaratory judgment of noninfringement. [227-1] ¶ 6.

Colin Helsen, Defendants' 30(b)(6) witness and "the guy in charge of shuffling machines" for Defendants, [221] ¶ 1; [227-1] ¶ 1, testified that, although he was aware of other companies that sold automatic shufflers to casinos in the United States between 1998 and 2009, he could not name a single entity that existed as an "independent competitor" to Defendants. [222-10] at 682. *See also id.* at 685 ("Q. And do you recall indicating to me that you were not aware of any competitors in the market for automatic card shufflers in the United States from 2009 to 2018, other than a single Shuffle King and the AGS Dex S? Is that correct? A. Yes."). Helsen testified that, even though competition could be good in the sense that it allows customers to "benchmark you on your performance," the "aim of every company in business is to have as big a market share as they can." [222-10] at 681. Defendants

pursued this aim with gusto: Helsen testified that he recalled seeing external estimates that Defendants captured 85 to 90 percent of the United States' automatic shuffler market and admitted that within the company they discussed market share numbers that high or higher. [222-10] at 671–73. With regard to competitors in the U.S. market, Helsen could think of just two during the period of time from 2009 to 2018: the Apex and the Shuffle King; and he could not recall more than one being sold in the United States during this timeframe. *Id.* at 684. When reviewing a list of competitors, Helsen could not identify a single unit any of those competitors had sold or leased to any casinos in the United States. *Id.* at 685–89.

Defendants' internal documents confirm this characterization of Defendants' market domination. *See, e.g.*, [222-8] at 171 ("we have attained an almost 100% share world-wide for shufflers. Furthermore, this is the category in which we have the greatest international patent protection. Because most of the patents in this category are 'apparatus patents' rather than 'method patents,' we have been able to obtain excellent protection in many regions."). Defendants claim their "success in the United States" stems from "the quality, innovation and reliability of [their] premium products, as well as their service and preventative maintenance offerings." *Id.* But evidence supports Plaintiffs' suggestion that Defendants' aggressive acquisition and litigation strategies drove their successes.

The record also includes evidence indicating that Defendants viewed Plaintiffs' product as a threat to their market dominance. A November 2012 email from Helsen to Steve Dragg, Defendants' international controller, states that Defendants were

6

"under extreme pressure right now with the Aplus which is a copy off and competes for the same segment of the market as the OTS."[2] [222-11] at 295–96. A June 2014 email from Helsen to Derik Mooberry (Group Chief Executive Officer of Gaming) and Roger Snow (Chief Product Officer and Senior Vice President) discusses an "analysis" he "did recently" on the "threat to our business" posed by the A Plus; he notes that the A Plus "is currently our number one threat" and explains that it is "already having an impact and will be a minimum of 10% - probably as high as 25%." [222-8] at 158. The email attached a spreadsheet showing two tables: the first labelled "Potential Impact of Aplus Shuffler on OTS lease, sales and service revenue;" and the second labelled "Potential Impact of Aplus Shuffler on i-Deal lease, sales, and service revenue." *Id.* at 159. Each table has a row titled "Loss of Market Share," which includes cells with the following values: 10%, 25%, 50%. *Id.* Although Defendants dispute that the email and attachment constitute a "projection," the information remains relevant to Plaintiffs' claim that, absent Defendants' alleged predatory litigation strategy, the A Plus Shuffler would have (even based upon a quick analysis) garnered significant market share. Helsen's deposition testimony also confirms that Defendants were talking and strategizing about how to deal with the threat the A Plus posed abroad, including "spitballing" the idea of a "hostile takeover" of Taiwan Fulgent. [222-10] at 695–98.

---

[2] OTS refers to the One2Six Shuffler.

### C.    Prior Art References and PTO Submissions/Omissions

Plaintiffs claim Defendants procured certain patents by fraud.  More specifically, they claim that, in connection with their prosecution of the '096 and '751 patents (which occurred, respectively from April 15, 1998 through July 3, 2001 [200-46], and from October 16, 2000 to July 8, 2003 [200-47]), Defendants were obliged to disclose four prior art references: (1) the Luciano Prototype; (2) the Nicoletti Prototype; (3) the Roblejo Prototype; and (4) the Roblejo '122 patent (which issued in November 1999).  [200] ¶ 54; [221] ¶ 54; [32] ¶ 69.[3]

The Nicoletti Prototype, designed by Adolf Nicoletti in 1985 and produced by Precision Automation, was "designed to be built into a gaming table so that only the top plate of the machine is visible on the table and the shuffling takes place below the table."  [200] ¶ 55.  A version of the Nicoletti Prototype was demonstrated in Bally's Park Place Casino in Atlantic City, NJ for one week in 1990; the demonstration was supposed to run for 90 days but was cut short after a week when the shuffler malfunctioned.  [200] ¶ 56.  John Breeding, founder of Shuffle Master, testified that he had heard about, but not seen, the Atlantic City demonstration and heard the shuffler "was so big it was built under the table and cards would go down inside. It lasted a few months and then it was gone. It was huge." [200] ¶ 57; [221] ¶ 57; [200-33] at 11, 96.  Breeding retired on October 31, 1997, before the applications that led to the issuance of the '096 and '751 patents were filed.  [200-33] at 40, 77.

---

[3]Plaintiffs concede that they lack evidence to prove that Defendants had an intent to deceive with respect to the Luciano prototype, [221] ¶ 54, and the Court thus focuses on the Nicoletti and Roblejo references.

The Roblejo Prototype, invented by Dr. Conrad Roblejo and built by Hal Solberg for Casino Concepts, made its debut at the 1997 World Gaming Congress and Expo held in Las Vegas in October 1997. [200] ¶¶ 61, 62; [221] ¶ 61. In contrast to the Nicoletti Prototype, the Roblejo Prototype (which Casino Concepts dubbed the Sure-Shuffler) was "designed to sit next to and be operated to the side of a gaming table." [200] ¶ 61. Defendants' in-house counsel, Jennifer Farrar, attended the 1997 Expo, though the parties dispute whether she actually saw the Roblejo Prototype demonstrated at that time. [200] ¶ 63; [221] ¶ 63. Other executives and employees of Defendants also attended the 1997 Expo, and one of them prepared a short report regarding five shufflers observed there, including the Sure-Shuffler; the report also attached a Sure-Shuffler promotional brochure. [200] ¶¶ 65, 66. A copy of the Sure-Shuffler promotional brochure was also found in a legal department file folder relating to the 1997 Expo. [200] ¶ 66. Although several employees opined that the Expo report was likely written by Attila Grauzer, the lead inventor on the patents at issue in this case, Grauzer himself testified that he did not write the report and did not see the Roblejo Prototype at the 1997 Expo. [200] ¶ 67; [221] ¶ 67. Plaintiffs dispute Grauzer's representations. [221] ¶ 67. In any event, with regard to the shuffler, the report states, "it could have an application in the California Poker rooms" and "adding and sorting feature will make it useful in sorting rooms." [200-25]. The brochure attached to the report emphasizes security and efficiency but says nothing about its particular features. *See* [200-26].

In 2003, an automatic card shuffler manufacturer named Casino Austria Research and Development ("CARD") sued Defendants seeking a declaratory judgment that CARD's One2Six Shuffler did not infringe Defendants' patents. [200] ¶ 71. During that litigation and, according to Plaintiffs, despite Defendants' delay and obfuscation, documents concerning the allegedly relevant prior art were produced, and depositions were taken concerning each of the prior art prototypes. [200] ¶ 72; [221] ¶ 72. CARD and Defendants settled their lawsuit in 2004, and, in the wake of that settlement, Defendants created what Plaintiffs call the "Shuffler Art Disks," a compilation of various documents, deposition transcripts, and other media produced during the CARD litigation concerning the allegedly relevant prior art. [200] ¶ 73; [221] ¶ 73. The Disks contained a huge volume of information, including 2,890 pages, two videos, three deposition transcripts, 11 court documents, 15 declarations, and interrogatory responses. [221] ¶ 73.

Defendants subsequently submitted the Shuffler Art Disks to the PTO in connection with various pending patent applications (or at least referred the examiners to the disks), and, despite alleged attempts by Defendants to misdirect the examiners from adequately considering the materials on the disks, the examiners considered at least some of those materials. [200] ¶¶ 74–75; [221] ¶¶ 74–75.

Defendants contend that they submitted the Shuffler Art Disks and the Roblejo '122 patent in connection with their applications for the '344, the '576, the '602, and the '791 patents. [200] ¶ 76. Plaintiffs dispute that Defendants submitted the disks in connection with the '344 and '576 patents, arguing that, rather than submitting

10

the disks, Defendants asked the PTO to transfer these items from the '344 and '576 patents' respective abandoned parent applications. [221] ¶ 76. Moreover, Plaintiffs contend, Defendants (in violation of their duty of candor owed to the PTO) requested the transfer in a manner designed to misdirect the patent examiner away from those materials. [221] ¶ 76. Plaintiffs concede that Defendants submitted the disks in connection with the '602 and '791 patent applications, but they again claim Defendants did so in a manner that misdirected the examiner away from the materials. *Id.*

The parties agree that each of the examiners for the '344, '576, '602 and '791 patent applications initialed the relevant information disclosure statement ("IDS") in the box next to the entry showing the group exhibit "Shuffler Art Disks," though they dispute the meaning of those initials. [200] ¶ 77; [221] ¶ 77. Defendants claim the initials show that the examiners reviewed the contents of the disks, including the information disclosing the Roblejo prototype and patent; Plaintiffs argue that, because of the volume of materials submitted and the manner in which the materials were submitted, the initials cannot be read to mean that each examiner necessarily reviewed in detail every document available on those disks. [221] ¶ 77.

With discovery now closed, Defendants have moved for summary judgment on Plaintiffs' antitrust claim, arguing that Plaintiffs have not carried their burden of establishing the relevant market and that they have failed to support their damages claim. *See* [198]. Alternatively, Defendants seek partial summary judgment, arguing that Plaintiffs cannot show that they had the intent to deceive the PTO in the

prosecution of the '096 and '751 patents, and cannot prove inequitable conduct (and thus, unenforceability) with respect to the '344, '576, '602, and '791 patents. *Id.* The Court considers each argument below.

### D.     The *Shuffle Tech* Litigation

Before turning to the merits of the parties' arguments, the Court briefly discusses prior litigation involving these same Defendants but different plaintiffs, which both sides invoke: *Shuffle Tech International LLC, et al. v. Scientific Games Corporation*, et al, No. 15 C 3702 (N.D. Ill.).

In *Shuffle Tech*, the plaintiffs (like Plaintiffs here) alleged that Defendants used enforcement of their invalid patents to suppress competition in the market for automated playing card shufflers in violation of § 2 of the Sherman Act. As here, Defendants moved for summary judgment, arguing that the plaintiffs failed to provide evidence from which a reasonable juror could infer that Defendants had the specific intent to defraud the PTO. Judge Kennelly denied the motion. *Shuffle Tech Int'l LLC v. Sci. Games Corp.*, No. 15 C 3702, 2017 WL 3838096, at *14 (N.D. Ill. Sept. 1, 2017).

The plaintiffs in *Shuffle Tech* alleged, as here, that Defendants defrauded the PTO by intentionally omitting material prior art references (there, the Nicoletti shuffler, the Luciano prototype, the Roblejo prototype, and the Block '044 patents) from the prosecution of two patents not at issue here, the '982 and the '935 patents, as well as in reexamination proceedings on both patents. Judge Kennelly found that the plaintiffs had failed to prove their allegations with respect to the first three prior

12

art references but found that they had presented evidence from which a reasonable jury could conclude that Defendants failed to disclose the Block '044 patent during prosecution of the '982 patent with the intent to deceive the PTO. *Id.,* 2017 WL 3838096, at *11–12; *see also* [200] ¶¶ 68–70. Judge Kennelly also found that the plaintiffs presented evidence from which a jury could reasonably conclude that Defendants fraudulently omitted the Nicoletti, Luciano, and Roblejo references during the prosecution of the '935 patent. *Shuffle Tech,* 2017 WL 3838096, at *13. For these reasons, Judge Kennelly denied Defendants' motion for summary judgment. *Id.* at *14. This Court discusses specific aspects of the *Shuffle Tech* decision in greater detail below.

## II.    **Applicable Legal Standards**

Summary judgment is proper where there is no genuine dispute as to "any material fact" and the movant becomes entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue

of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia, Illinois*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; instead "there must be evidence on which the jury could reasonably find for the non-moving party." *Anderson*, 477 U.S. at 252.

### III. Discussion & Analysis

When a party fraudulently obtains a patent and uses that patent to monopolize a particular market or field, injured parties may sue for violation of the Sherman Act. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174 (1965) ("Enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."). "Fraud" for purposes of a *Walker Process* claim means "knowingly and willfully misrepresenting facts to the Patent Office"; it must be based upon "clear, unequivocal and convincing" evidence. *Walker Process*, 382 U.S. at 177; *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 875 (Fed.Cir.1985); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198, 1204 (7th Cir. 1970). Showing "fraud on the PTO" under *Walker Process* requires "evidence that: (1) the patent at issue was procured by knowing or willful fraud on the PTO; (2) the defendant was aware of the fraud when enforcing the patent; (3) the defendant clearly intended to deceive the examiner; and

(4) the patent would not have issued but for the misrepresentation or omission." *Farag v. Health Care Serv. Corp.*, No. 17 C 2547, 2017 WL 2868999, at *6 (N.D. Ill. July 5, 2017) (citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068–71 (Fed. Cir. 1998); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998)). Proof of "technical fraud" or omissions will not suffice. *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 651 F. Supp. 1482, 1499–1500 (N.D. Ill. 1986).

Section 2 of the Sherman Act prohibits the wrongful monopolization of interstate trade or commerce. 15 U.S.C. § 2. In addition to proving that the defendants obtained their patents by fraud, a *Walker Process* claimant must prove the other elements of a § 2 violation. *Walker Process*, 382 U.S. at 177–78. For starters, a plaintiff must satisfy the antitrust injury doctrine, proving that its loss resulted from actions the defendants took to reduce output or raise prices to consumers. *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 899 (N.D. Ill. 2009) (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990); *Stamatakis Industries, Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)). Then, to prevail on a claim under § 2, a plaintiff must also show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 827 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–

15

71 (1966); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011)). *See also In re Fico Antitrust Litig. Related Cases*, No. 1:20-CV-02114, 2023 WL 6388247, at *4 (N.D. Ill. Sept. 28, 2023) (Section 2 of the Sherman Act "prohibits the employment of unjustifiable means to gain that power" and requires two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power").

Defendants argue that Plaintiffs have failed to properly identify a relevant market for purposes of assessing monopolization; they also argue that Plaintiffs have failed to support their damages claim with substantive evidence. The Court considers these specific arguments below.

### A.    The Relevant Market

As *Walker Process* explains, "upon finding fraudulently obtained patents," the court must "appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved," 382 U.S. at 177, and "if exclusionary, it is necessary to consider whether the exclusion satisfies traditional antitrust injury." *Inguran, LLC v. ABS Glob., Inc.*, No. 20-CV-349-WMC, 2023 WL 5254780, at *7 (W.D. Wis. Aug. 14, 2023) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). To do that, the injury must be "to the relevant market," and must "either reduce output or raise prices to consumers," *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019), since the injury must be to competition, not merely economic loss to a competitor. *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 345 n.7 (7th Cir. 2022).

16

"A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *In re Fico Antitrust Litig. Related Cases*, 2023 WL 6388247, at *4 (quoting *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916–17 (7th Cir. 2020); *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). In other words, a relevant market is defined "by the reasonable interchangeability of the use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* (quoting *Sharif*, 950 F.3d at 918; *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

Plaintiffs define the "relevant market" as "casino grade automatic card shufflers in the United States." [217] at 10. Defendants argue that Plaintiffs' relevant market remains "too narrow because it does not encompass all potential substitutes for automatic shufflers (*e.g.,* hand shuffling) and simultaneously too broad because different types of automatic shufflers do not compete with one another." [227-1] ¶ 12. Defendants suggest that the market mut be further narrowed to account for the different categories of casino grade automatic shufflers: continuous, batch, and specialty. [203] at 15.

But Plaintiffs (and their expert, Dr. Matthew Lynde) excluded hand shuffling from the relevant market because it does not satisfy concerns relating to security and efficiency. *See* [200-19] at 14. Based upon the record, this Court agrees and rejects Defendants' suggestion that the relevant market should include hand shuffling.

Likewise, Defendants' arguments concerning the different types of models remains unpersuasive. Dr. Lynde recognized that the different models of automatic shufflers exist and that shufflers may be programmed or customized for specific tables or games. But the record shows that Taiwan Fulgent designed the A Plus Shuffler, "a multi-deck continuous shuffler," to be "programmable with specialty and batch capabilities." [200-19] at 18. Plaintiffs contend that the A Plus Shuffler, like CARD's One2Six outside of the United States, "is a one-size-fits-all shuffler promoted and used for all games, including blackjack and virtually all specialty games. As such, the A Plus competes directly with Defendants' i-Deal and MD products in addition to Defendants One2Six 'continuous' shufflers." [221] ¶ 10. Defendants do not dispute that the A Plus shuffler "can be used for blackjack and programmed for certain specialty games, such as certain poker variants." [227-1] ¶ 6. And Plaintiffs have offered evidence to demonstrate substitutability generally.

For example, Colin Helsen testified that, although certain shufflers may be superior or better suited for certain games, shufflers are commonly swapped out in certain circumstances. [222-10] at 709. Helsen's June 7, 2014 email and threat analysis bolster the notion that Plaintiffs' shufflers remain substitutable for at least some of Defendants' shufflers. [222-8] at 158–163. Bradley Broderick, former TCS COO of the Americas, confirmed that, on certain games, including Blackjack, batch and continuous shufflers were substitutable. [222-10] at 187. That shufflers within the market may have fewer or more functional enhancements does not mean Plaintiffs have failed to meet their burden in defining the relevant market, and

18

Defendants remain free to cross-examine Dr. Lynde and other witnesses concerning the relative substitutability of the various shufflers.

Defendants fault Plaintiffs for failing to offer economic analysis. And, to be sure, to demonstrate competition in an antitrust case in the Seventh Circuit, the plaintiff typically "must provide an economic analysis of the relevant market." *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) (citing *Menasha Corp. v. News Am. Mktg. In–Store, Inc.*, 354 F.3d 661 (7th Cir.2004) (requiring economic evidence to prove the existence of a distinct market). But where, as here, Plaintiffs have provided evidence to suggest that Defendants have literally cornered the relevant market on casino-grade automatic card shufflers in the United States, the economic analysis is simple: virtually all sales of casino grade shufflers in the United States trace back to Defendants. In *Shuffle Tech*, the parties accepted Judge Kennelly's definition of the relevant market as the "market for automated playing card shufflers" and the "automatic shuffler market." *Shuffle Tech*, No. 15-cv-03702, 2017 WL 3838096, at *1, 2. Plaintiffs' definition here follows suit and finds sufficient support in the record. The Court thus declines to grant judgment in Defendants' favor on the basis of any deficiency in Plaintiffs' definition of the relevant market.

## B. Plaintiffs' Damages Evidence

Defendants next argue that Plaintiffs' damages evidence compels the entry of judgment in Defendants' favor. Generally, an antitrust plaintiff excluded from a market by anticompetitive activity is "entitled to recover as damages the difference between what it would have made in a hypothetical free market and what it actually

19

made." *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 651 F. Supp. 1482, 1501 (N.D. Ill. 1986) (citing *Dolphin Tours v. Pacifico Creative Service*, 773 F.2d 1506, 1511 (9th Cir.1985)). The plaintiff may measure these damages by reference to its profits before and after the illegal activity, by examining the profits of a comparable business not affected by the anticompetitive activity, and by projecting the market share it would have attained absent the anticompetitive activity. *Id.* But the plaintiff must prove damages "with reasonable certainty" because a damages claim "may not be based on mere speculation." *Id.* (citing *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 381–383 (7th Cir. 1986); *Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 328 (7th Cir.1982); *Webb v. Utah Tour Brokers Association,* 568 F.2d 670, 677 (10th Cir. 1977)).

Defendants argue that Plaintiffs' damages models turn entirely on Dr. Lynde, and they urge the Court to exclude his damages opinions as fundamentally unreliable. [203] at 26. In particular, Defendants claim Dr. Lynde's reliance on foreign markets as "benchmarks" remains flawed because those benchmarks are speculative; they also argue that Lynde's reliance on Colin Helsen's 2014 market impact assessment remains problematic because Lynde has no real foundation to accept Helsen's figures for this purpose. Rightfully, Judge Kennelly rejected this latter argument in the prior litigation, stating:

> Defendants contend that Dr. Lynde's analysis on this point is based almost exclusively on sales goals that plaintiffs themselves set—an insufficiently reliable basis—and that he did nothing to validate or test this figure. There is little doubt that this is the softest spot in Dr. Lynde's analysis, but that does not make his opinions inadmissible. Part of the problem here is that plaintiffs' theory is that defendants' wrongful

> conduct prevented them from getting into the market at all, and thus plaintiffs do not have a proven track record of their own from which to generate a reasonable estimate of lost profits. This sort of uncertainty does not preclude an award of damages . . . Nor does it preclude Dr. Lynde's testimony on the point.

[230] at 4 (citations omitted). Having played the same card regarding the same expert, Defendants get the same result. As before, the offered expert meets the minimal requires for admissibility under Rule 702, and "it will be for the jury to decide whether plaintiffs' contention regarding the sales they would have made but for defendants' conduct is sufficiently supported by the evidence to serve as a basis for a damage award." And, as before, Defendants remain free to test Dr. Lynde's assumptions and opinions at trial through cross-examination, whether those assumptions and opinions relate to foreign market benchmarks or the parties' internal sales goals and threat analyses.

### C. Patent Issues

Finally, Defendants argue that they are entitled to summary judgment as to two discrete patent issues relating to the *Walker Process* claim. First, Defendants seek a declaratory judgment that Plaintiffs cannot prove Defendants had any intent to deceive the PTO in connection with the prosecution of the '096 and '751 patents. Second, Defendants seek a declaratory judgment that Plaintiffs cannot prove inequitable conduct with regard to the patent applications for which Defendants submitted the Shuffler Art Disks (the applications that led to the issuance of the '344, '576, '602, and '791 patents).

### 1. Evidence of Intent

In *Shuffle Tech*, Defendants moved for summary judgment on the plaintiffs' *Walker Process* claim, arguing that the plaintiffs lacked evidence to show that Defendants had specific intent to defraud the PTO; Judge Kennelly agreed with regard to the prosecution of the '982 patent but disagreed with regard to the prosecution of the '935 patent and the reexamination of both the '982 and the '935 patents. No. 15-cv-3702, 2017 WL 3838096, at *11–13, 14. Defendants ask this Court to apply these findings to the '096 and '751 patents, based upon the timing of the applications relative to the '982 patent application. Plaintiffs concede that they lack evidence to prove that Defendants had an intent to deceive with respect to the Luciano prototype. [221] ¶ 54. But they oppose Defendants' request for judgment with respect to the Roblejo prototype.

Defendants filed the application for the '982 patent in April of 2002, and the patent issued in November of 2003. With regard to the Roblejo shuffler, Judge Kennelly determined that the plaintiffs presented evidence from which a reasonable jury could infer that Defendants were aware of the Roblejo prototype during prosecution of the '982 (based in large part upon the evidence showing that Grauzer and Farrar attended the 1997 Expo). *Shuffle Tech*, No. 15-cv-3702, 2017 WL 3838096, at *12. But he held that plaintiffs "failed to provide evidence from which a reasonable jury could infer that Defendants intentionally omitted mention of this reference with fraudulent intent." *Id.* Judge Kennelly noted that the '982 issued based upon its novel disclosure of an automatically moveable cover on the elevator for raising the shuffled cards, a feature also disclosed in the Roblejo prototype, but he

found no clear evidence that "anyone at SHFL was aware that the Roblejo prototype contained an automatically moveable cover." *Id.*

Defendants filed the application for the '935 patent in October 2003, and the patent issued in April 2009. By this time, Defendants' deceptive intent could reasonably be inferred based upon developments in the CARD litigation, Judge Kennelly held, where CARD argued that three of Defendants' patents were invalid as anticipated by the Nicoletti, Luciano, and Roblejo prototypes, and based upon Defendants' "selective disclosure" of the Shuffler Art Disks and their "lack of candor" regarding the novelty of the device in the '935 patent. *Id.* at *13.

Defendants filed the application that led to the '096 patent in April 1998 and the patent issued July 3, 2001, and they filed the application that led to the '751 patent in October 2000, with the patent issuing July 8, 2003. Both applications thus preceded the *Shuffle Tech* patent applications by several years. If, as Judge Kennelly held, Defendants lacked intent in late 2003, it necessarily follows that they lacked intent before 2003. Not so, Plaintiffs say. Defendants filed the application that ultimately resulted in the issuance of the '096 patent on April 18, 1998, just six months after Defendants' representatives attended the 1997 Expo and saw the Roblejo prototype in action. [217] at 34–35. Plaintiffs also argue that, whereas there was no evidence that Defendants knew that the Roblejo prototype contained an automatically moveable cover, there *is* evidence that Defendants' representatives knew the Roblejo prototype had a wheel allowing multiple cards per compartment and a beveled surface because those features were plainly visible in the 1997 Expo

23

demo and emphasized by the Casino Concepts representatives manning the booth. [217] at 35.

The record includes evidence from which a jury could reasonably infer that Defendants' representatives saw the Roblejo prototype demonstrated at the 1997 Expo; it also includes evidence to the contrary.[4] But either way, even if the Court credits Plaintiffs' claim that Farrar and Grauzer (or other representatives of Defendants) saw the Roblejo prototype demonstrated at the 1997 Expo, Plaintiffs have offered no evidence to show that they understood or appreciated its significance as prior art at that time. Farrar denies seeing the transparent "side of the machine," [214-20] at 296, which remains consistent with Hal Solberg's testimony that, the way the booth was set up, "a casual person waking by wouldn't have seen [the shuffler]." [214-20] at 182. And no one at Casino Concepts specifically ties a detailed demonstration of the shuffler to Defendants. Solberg testified that he gave a detailed demonstration of the shuffling at one time during the Expo, opening the top cover

---

[4] For example, Attila Grauzer, head of engineering for Defendants, denied any recollection of seeing the Casino Concepts booth or shuffler at the 1997 Expo. [214-20] at 357. Donald Barnett testified that he may have seen the Sure-Shuffler but may also just have seen the brochure sometime after the 1997 Expo. [214-20] at 740. And Robert Pietrosanto testified that the Shuffle Master team at the Expo did not leave the Shuffle Master booth unless they were going to the restroom or to grab something to eat; "other than that, they were in that booth catering to our prospects and our clients." [214-20] at 695. Jennifer Farrar similarly testified that she did not recall seeing the Casino Concepts shuffler demonstrated at the Expo. [214-20] at 275–76. Farrar testified that she "wandered the show floor by myself for a day and a half and then I went home." *Id.* at 273. Farrar testified that she remembered seeing the Casino Concepts booth at the Expo, but "there was no one in the booth" when she walked by; no one was manning the booth. *Id.* at 276. Halvard Solberg's testimony suggests Farrar's claim remains implausible: Solberg, who built the Roblejo prototype and helped man the Casino Concepts booth at the 1997 Expo, testified that their booth would never have been unmanned during the Expo. And an internal Casino Concepts memo suggests that the Casino Concepts team did, in fact, demonstrate the Roblejo prototype to "people from Shuffle Master." [214-20] at 297; [214-2] at 174. Indeed, Farrar admitted that Defendants sent her to the Expo to "collect information" and to "monitor competitive activity." *Id.* at 272, 277. And she admitted that she received Casino Concepts' brochure. [214-20] at 275–76.

and removing the side covers, [214-20] at 183, but he does not know who saw that demonstration and could not tie it to Shuffle Master. *Id.* And, although Grauzer admitted to seeing the Casino Concepts Sure-Shuffler brochure, he testified that he could not tell anything about the shuffler's wheel feature from the pictures in the brochure. [214-20] at 361, 390.

Defendants' "report on shuffler competition" prepared (by someone) in the wake of the Expo, does not mention the wheel or the beveled surface (the features Plaintiffs say made it relevant prior art). *See* [200-25]. Instead, the report says only, "attached is their brochure"; "it could have an application in the California Poker rooms"; "adding and sorting feature will make it useful in sorting rooms." *Id.* The attached brochure also says nothing about the wheel allowing multiple cards per compartment or a beveled surface. *See* [200-26]. Even the internal Casino Concepts memo says nothing about whether the "people from Shuffle Master" viewed or appreciated any specific features in the prototype. It says only that "people from shuffle master looked at our equipment." [214-2] at 174. Although the memo also indicates that the Casino Concepts team "set the machine up for two decks and demonstrated the readability and the way it could break up a clump," *id.*, it does not tie that demonstration to anyone at Shuffle Master; nor does it mention the wheel or the beveled surface. As a result, the Court finds that Plaintiffs, like the plaintiffs in *Shuffle Tech*, have failed to offer evidence from which a jury could reasonably infer that Defendants had the intent to deceive the PTO when they filed the '096 and '751 patent applications without disclosing any Roblejo prior art reference.

Despite Plaintiffs assertion that Farrar lied about the significance of what she saw at the 1997 Expo, they have failed to provide supporting evidence in the record. This Court previously noted Defendants' concessions that "the Roblejo Prototype was demonstrated at the 1997 Expo; that Farrar attended the 1997 Expo; and that she saw the Roblejo Prototype at that time," [243], but this Court did not decide whether Farrar knew Roblejo constituted prior art and then deliberately withheld the references from the PTO during the prosecution of the '096 and '751 patents. Now, on a full record, the Court finds that Plaintiffs have failed to provide evidence to substantiate their claim as noted above.[5]

As for the Nicoletti Prototype, the record shows that it was developed in 1985 and demonstrated in Bally's Park Place Casino in Atlantic City, NJ for one week in 1990; the only evidence connecting Defendants to this shuffler is the testimony of

---

[5] This conclusion of course says nothing about Defendants' intent or knowledge in 2009 or 2012, when they initiated the lawsuits underlying Plaintiffs' sham litigation claim. Nor does it preclude any liability predicated upon a failure to submit an IDS in connection with the '096 and '751 patents. Indeed, exactly how Shuffle Master cited the Roblejo prior art references remains relevant. Mark Litman, who handled a lot of prosecution for Shuffle Master, [214-20] at 96, acknowledged that he had a "duty to submit information" to the PTO that he was "aware of that was material to the prosecution of the claims" in the patent application, *Id.* at 125. To this end, he testified, Shuffle Master cited the Roblejo patent "regularly" in the prosecution of patent applications and the patent "often was part of review by the PTO in patent applications on shuffling machines." *Id.* at 108, 146. Litman also testified that Shuffler Master submitted the Shuffler Art Disks to the PTO as part of various Information Disclosure Statements in 2004, 2005, 2006, and 2007. [214-20] at 118–23. Litman testified that the Shuffler Art Disks were submitted to the PTO for consideration in some cases, and not submitted in other cases. *Id.* at 132–33. He acknowledged that the Roblejo '122 patent was disclosed in Information Disclosures Statements submitted in January and February of 2001. *Id.* at 147. But the '122 patent was not disclosed in the application for the '096 patent. Nor was it disclosed in the '751 patent application, though certain claims of the '751 were disallowed, cancelled, and amended on re-examination based upon that reference. *Id.* at 147–50. Jennifer Farrar testified that she and Mark Litman "made decisions on what art to cite" in what applications and decided whether to include the Shuffler Art Disks in particular patent applications, based in part upon "privileged advice from" litigation counsel. [214-20] at 303. But she admitted that, of course, litigation counsel did not go in and review pending claims and determine whether and when to file the IDS. *Id.* She testified that litigation counsel made the Disks and thus knew what was on them; she merely did a "very light review" of their contents. *Id.* at 301.

John Breeding, admitting that he had heard about a shuffler demonstration in Atlantic City but did not see it, and that Defendants were offered a chance to invest in or purchase the technology but passed because the shuffler was huge and had to be built under the table. [200] ¶ 57; [221] ¶ 57. The evidence falls short of demonstrating that Defendants knew about the Nicoletti Prototype and any potential significance as prior art during the relevant timeframe (roughly April 15, 1998 through July 8, 2003, [200-46], [200-47]).

### 2. The Shuffler Art Disks

Defendants next ask the Court to find that Plaintiffs cannot show that their latter issued or "child" patents are unenforceable. They argue that, because Defendants submitted the Shuffler Art Disks in all of the applications that led to the issuance of those patents, Defendants are entitled to judgment as a matter of law on Plaintiffs' claim of infectious unenforceability as to these patents.

Inequitable conduct includes "affirmative misrepresentation of material fact, failure to disclose material information, or submission of false information, coupled with an intent to deceive." *Young v. Lumenis, Inc.,* 492 F.3d 1336, 1348 (Fed. Cir. 2007) (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)). The "withholding of information must meet thresholds of both materiality and intent." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed. Cir. 1995)) (citing *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988) ("Materiality does not presume intent, which is a separate and essential component of inequitable conduct.")).

27

Under the "infectious unenforceability" doctrine, "inequitable conduct associated with one patent may render a related patent unenforceable—so long as the inequitable conduct at issue bears 'an immediate and necessary relation' to the enforcement of the related patent." *Feit Elec. Co., Inc. v. CFL Technologies*, LLC, No. 13-CV-9339, 2021 WL 2473794, at *2 (N.D. Ill. June 17, 2021) (quoting *Guardant Health, Inc. v. Foundation Med., Inc.*, Nos. 17 CV 1616, 17 CV 1623, 2020 WL 2477522, at *5 (D. Del. Jan. 7, 2020)). *See also Agfa Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (continuation patent unenforceable because of inequitable conduct found in prosecution of parent application).

Essentially, Defendants assert a reverse infectious unenforceability argument: because Plaintiffs premise their unenforceability argument on the failure to disclose the prior art references, the disclosure of the Shuffler Art Disks (which include those references) slams that door shut. Defendants argue that in each case where the Shuffler Art Disks were submitted, the examiner initialed the reference, suggesting that he considered the material, including the Roblejo reference.

But Plaintiffs have offered evidence to show that the way Defendants "submitted" the Shuffler Art Disks, itself, suggests an intent to deceive. Although Plaintiffs' expert, Robert Armitage, acknowledges that an examiner's initials by a reference on an IDS suggests that the examiner has given it "some consideration," [200-12] at 36, because of the how Defendants submitted the materials here, the initials demonstrate only a cursory review of the Disks, not a review of any specific reference. *See* [214-18] at 34, 42. The record also includes evidence to show that

28

Defendants crafted the "Special Notice" accompanying the Disks in a way that suggested nothing on the disks would impact the examiners' patentability analysis.

The Federal Circuit has recognized that a reference may be characterized in such a way as to mislead the patent office. *Molins v. PLC v. Textron, Inc.*, 48 F.3d 1172, 1183–84 (Fed. Cir. 1995). Robert Armitage invokes this principle. Armitage acknowledges that, in the absence of the "Special Notice" accompanying the Shuffler Art Disks, Shuffle Master likely had no obligation to highlight, among the large volume of documents, information specific to the Roblejo shuffler. [200-14] at 233. But, based upon USPTO guidance, where an applicant chooses to make a "Special Notice," patent examiners will justifiably expect that the contents do highlight what is most significant; and the failure to highlight anything here suggested that a careful review of the entire set would yield nothing significant. *Id.* at 234. In fact, the notice represents that the materials were compiled and crafted in connection with litigation and that the materials (which are voluminous) may not definitively disclose the date the relevant prototype would be available as a reference. *See* [214-18] at 24. And Litman signed the Notice, despite his deposition testimony that he had not even inventoried or reviewed the contents of the Disks when Defendants filed the IDSs. Based upon this evidence, genuine issues of material fact exist as to whether Defendants' submission of the Shuffler Art Disks absolves them of any claim of inequitable conduct as to the latter issued patents.

## IV. Conclusion

For the reasons explained above, the Court grants in part and denies in part Defendants' motion for summary judgment. The Court grants the motion in one respect: Plaintiffs have failed to offer evidence from which a jury could reasonably find Defendants' specific intent to defraud the PTO by failing to include the Roblejo and Nicoletti references in the applications that led to the issuance of the '096 and '751 patents. The Court denies the motion in all other respects.

Dated: March 28, 2024                    Entered:

                                        John Robert Blakey
                                        United States District Judge